No. 03-567

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 121

JAMES EDWARD MASSEE, MICHAEL WILLIAM
MASSEE, and RAYMOND MASSEE as Guardian and
Conservator of MARCUS JAMES MASSEE,

           Plaintiffs and Appellants,

   v.

RICHARD THOMPSON and BROADWATER COUNTY,

           Defendants and Respondents.

APPEAL FROM:    District Court of the First Judicial District,
                 In and for the County of Broadwater, Cause No. DV 2000-17
                 The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

            James G. Hunt, Hunt & Molloy Law Firm, Helena, Montana

        For Respondents:

            Elizabeth S. Baker, Stuart L. Kellner, Hughes, Kellner, Sullivan & Alke,
            Helena, Montana

        For Amicus:

            Monte Jewell, Smith Jewell, PLLP, Missoula, Montana
            (for Silent Witnesses, et al.)

            Mikel L. Moore, Christensen Moore Cockrell Cummings & Axelberg,
            Kalispell, Montana (for Montana Sheriffs and Peace Officers Association)

                        Submitted on Briefs:  February 24, 2004
                                Decided:  May 5, 2004

Filed:

                             Clerk
Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 James, Michael and Marcus Massee (the Massees or the sons) are the surviving sons of Vickie Doggett, who was fatally shot by her husband, Ray Doggett, in May 1997. The Massees brought a wrongful death action against Sheriff Richard Thompson of Broadwater County (the Sheriff or Thompson) and Broadwater County, as principal. A jury returned a verdict in favor of the Massees in February 2003, awarding the sons a total of $358,000. On a Motion for Judgment as a Matter of Law, the First Judicial District Court vacated the jury verdict on the grounds that the Sheriff had no legal duty to protect Vickie from Ray and could not be held liable for failure to do so. The Massees appeal. We reverse.

## ISSUE

¶2 The only issue before this Court is whether the District Court erred by granting Thompson's Motion for Judgment as a Matter of Law.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The following facts, while lengthy, are critical to the jury's verdict, the District Court's Order, and our decision here.

¶4 Vickie Sue Massee (Vickie) and Ray Doggett (Ray) were married in October 1990. Prior to Vickie's marriage to Doggett, Vickie had been married to Raymond Massee (Massee). She had three sons during her marriage to Massee, James, Michael and Marcus. For most of the times at issue, the three boys lived with Vickie and Ray.

2

¶5 Over the course of the Doggetts' tumultuous marriage, members of the Broadwater County Sheriff's Office (BCSO or Sheriff's Office), and most notably Thompson, became intimately involved in the lives of Ray and Vickie. BCSO's first involvement with the couple occurred approximately one year after Vickie and Ray got married, when the Sheriff's Office responded to a domestic violence disturbance at the Doggetts' home. Vickie and Ray had each struck and injured the other. They were sentenced to counseling which they completed.

¶6 From the record, it appears that the marriage had frequent ups and downs, with the downs generally occurring after Ray and/or Vickie had been drinking. Ray became unable to work shortly after he and Vickie married and he began suffering from bouts of depression. With his depression came binge drinking, accusations of infidelity, and threats of suicide or murder.

¶7 Just before midnight on October 29, 1994, the Broadwater County Undersheriff responded to a call from Vickie. She was at a Townsend bar and asked that an officer come get her, collect her sons, and then drive them all to the county line to be picked up by the children's grandparents. Vickie indicated that she and Ray were arguing and that she wanted to be away from Ray. Undersheriff Ludwig responded. On the way to the county line, Vickie decided she would let the boys go with their grandparents, and she would return home. Undersheriff Ludwig, after confirming there had been no physical violence in the earlier argument, convinced Vickie that she and Ray should spend the night apart while each sobered up. Vickie ultimately conceded.

3

¶8　On Ludwig's return to Townsend, she was then dispatched to Ray's house. Ray had called the BCSO threatening suicide if Ludwig did not tell him where Vickie was. When Ludwig arrived at the Doggetts' home with a reserve deputy, Ray was sitting at a table with a loaded .44 magnum pistol. Ludwig assured him that Vickie was safe, and while the reserve deputy talked with Ray in an effort to calm him, the Undersheriff took Ray's pistol for safekeeping. The record is unclear as to when the weapon was returned to Ray.

¶9　On December 10, 1994, the BCSO received another domestic dispute call from the Doggetts' home, and two deputies were dispatched. According to the Sheriff's Office log, Vickie and Ray were intoxicated and engaged in a serious argument. When the two deputies arrived, they could hear the argument escalating. Upon entering the home, they discovered that one of Vickie's teenage sons was also present. The officers ushered him outside to safety and then returned inside, at which time Ray threatened them with bodily harm. Thompson was then called and advised of the situation. The Sheriff immediately telephoned Ray and began talking to him. At that time, one of the responding officers was called away to another incident. When the remaining officer got on the telephone to talk to Thompson, Ray left the room, ostensibly to go to the bathroom, but moments later emerged from the bedroom with the .44 magnum revolver (the same revolver that had been earlier confiscated). The deputy reported this to the Sheriff who told the deputy to leave the house immediately. The deputy obeyed. Shortly thereafter, the BCSO dispatcher called the Doggett home and Vickie told her that Ray was holding a gun to her head. Within minutes, the officer who had

4

responded to another call returned with a third officer. The three deputies stayed outside and awaited the Sheriff's arrival a few minutes later.

¶10 Thompson and a deputy entered the home while the other officers remained outside. Ray was agitated, drunk and wielding his .44 magnum handgun. After talking to the Sheriff for a short period of time, Ray put the gun to his own head. The Sheriff and his deputy were able to wrestle the loaded pistol from him. After several minutes of calming discussion, the deputies were told they could leave and the Sheriff remained to counsel Ray. Two deputies left. The third deputy waited in the car parked in a location that allowed him to see inside the Doggetts' home where Ray and the Sheriff were talking.

¶11 At trial, there was substantial testimony presented that one of the responding officers, as recorded in his official report, had seen Ray holding the gun to Vickie's head. This deputy also indicated in his report that the Sheriff decided not to arrest Ray but did confiscate Ray's gun. The Sheriff testified that he did not know that Ray had held the gun to Vickie's head until some later date, and that during the time he was at the Doggett residence, Ray had not done anything that would warrant arrest. The Sheriff's report of this event, however, differs from the Sheriff's testimony. Thompson's official report dated December 11, 1994, states, "While on the way into town, I heard the officers at the scene talking to dispatch and telling her that Ray was pointing the gun at Vickie."

¶12 After these events, the marriage appeared to stabilize somewhat. However, on October 6, 1996, the BCSO's log reflects three calls between 4:00 a.m. and 4:30 a.m. from Ray Doggett during which he sounded depressed and requested that the Sheriff come visit

him because he needed a friend. Then, again, in the early morning hours of December 18, 1996, Ray called for a deputy. When two deputies arrived, they found Ray alone and drunk. He was complaining, as he had before, that Vickie was being unfaithful. The officers then received an unrelated call, and Ray told them he would be all right and that they could leave.

¶13 About ten days later, Ray asked that the BCSO send a particular deputy to his home. When the deputy arrived, Ray was drunk and claiming that Vickie wanted him dead. Vickie told the officer that Ray was always threatening to kill himself and she was considering leaving the marriage because of the overwhelming stress. Vickie's son Marcus was also present, and informed the deputy that Ray had a revolver in the back of his pants. The deputy warned Ray that if Ray touched his gun, he would shoot him. The deputy stayed and talked with Ray until he was calm. Vickie and Marcus left the house during this time, upon suggestion of the deputy.

¶14 Within a few minutes of the deputy's departure, Ray called the BCSO to tell them he was going to the local bar. Meanwhile, Vickie and Marcus had arrived at the home of Roger Reiman, a friend of Vickie's sons. James and Michael were also present. She told them she wanted to spend the night in Helena, but was afraid to return to the house for the overnight items she would need. James and Roger went to get the items for her. When they arrived at the house and walked inside, Ray, who had returned from the bar and whose back was to the door, turned, pulled his gun and pointed it at them. He lowered it after about 5 seconds. James, who was quite frightened by the experience, retrieved his own .38 pistol while getting his mother's toiletry items, and hid it under his jacket in case he needed to protect himself

6

while leaving the house. While James was out of the room, Ray pulled his gun on Roger and suggested that they go outside. Just then, however, the BCSO called and Ray answered the phone. While Ray was on the phone with the Sheriff's Office, James and Roger left.

¶15    James and Roger immediately went to the BCSO to report what had occurred, but did not sign a formal complaint. Vickie and her sons left Roger's house, and spent the night with friends in Helena. James gave his gun to Roger before leaving because Roger was afraid Ray would come looking for him when he realized Vickie was not coming home that night.

¶16    Later that night, Roger called the BCSO to report that Ray had called and threatened to kill him and to hunt down Vickie, James and Michael and kill them for taking Marcus away. Shortly thereafter, Roger went to the Sheriff's Office and signed a Voluntary Statement regarding these threats. He did not sign a Complaint because, he later testified, he was afraid that Ray might hurt him. The deputy who took Roger's statement called and informed the Sheriff. Thompson said he would look into it the following day, but according to his own testimony, he failed to do so. Vickie, her sons, and Roger were never questioned about this incident and no investigation appears to have occurred. The BCSO's log indicates that when Vickie returned from Helena the following day, she made arrangements for the boys to temporarily stay with their grandparents in White Sulphur Springs.

¶17    During the ensuing four months, Ray and Vickie did not seek the services of the BCSO. However, at about 2:00 a.m. on April 20, 1997, then eight-year old Marcus called the BCSO reporting that Ray and Vickie were having an argument and that he and his fourteen-year old brother, Michael, were in their bedroom with their .22 rifle on the bed for

7

protection. According to the Sheriff's Office log, the dispatcher instructed the boys to put the gun away. The Sheriff and a deputy then went to the Doggetts' residence. According to the deputy's report, he immediately went to the bedroom with the boys and found the unloaded rifle put away in the closet. He reported that the boys said that the rifle was unloaded at all times during this event.

¶18    The boys told the officers that Ray's gun was in his bedroom. The deputy found Ray's gun on his bedside table, unloaded it and left the bullets on Ray's dresser. The deputy did not confiscate Ray's pistol but left it at the residence. Vickie, Michael and Marcus left the residence, followed shortly thereafter by the police officers. Vickie and the boys once again stayed with a friend in Helena.

¶19    At trial, Michael testified to a more detailed and slightly different version of the events of that evening. He stated that Ray and Vickie had returned home that night and were arguing. Michael saw Ray holding his .44 magnum pistol, waving it and pointing it at Vickie while arguing. He returned to his bedroom where Marcus was waiting, loaded his .22 rifle, and after listening to the escalating argument for about fifteen minutes, had Marcus call the BCSO. He stated at trial that during the course of the argument, Vickie, scared and crying, had come into their bedroom and shut the door. Ray opened the door and Michael saw that he was still carrying his .44 magnum pistol. However, according to Michael's testimony and the testimony of the officers involved, no one subsequently investigated the incident; therefore, they did not learn from Michael or Vickie that Ray had threatened Vickie with a loaded pistol that night.

¶20 On May 5, 1997, Ray stopped by the BCSO at 2:00 a.m., in an extremely depressed state. He later called the Sheriff's Office at 3:00 a.m. and again at 3:15 a.m. also quite depressed, triggering serious concerns that he was suicidal. The Sheriff's fears were realized when, less than three weeks later, on May 24, the BCSO responded to the Doggetts' home and discovered that Ray had shot and killed Vickie with his .44 magnum pistol, and then fatally turned the gun on himself.

¶21 Vickie's sons sued Sheriff Thompson for negligently failing to take appropriate action to prevent Ray from killing their mother. Between February 24 and February 27, 2003, a jury heard substantial evidence pertaining to the above events and the alleged negligence of the Sheriff. The jury concluded that Sheriff Thompson was negligent as defined by the jury instructions, and that his negligence was the cause of Vickie's death. The jury awarded a total of $358,000 to Vickie's sons.

¶22 On a Motion for Judgment as a Matter of Law filed by Thompson, the First Judicial District Court vacated the jury verdict. In its Decision and Order, the court analyzed each of the three domestic abuse statutes underlying the Massees' claims. These statutes are set forth verbatim below. The court concluded that the "weapon seizure" statute found at § 46-6-603, MCA (1995), did not impose upon the Sheriff the legal duty to seize Ray's weapon following the December 1996 and April 1997 episodes. The court further concluded that the provisions of the "arrest" statute, found at § 46-6-311, MCA (1993 and 1995), were discretionary rather than mandatory, and therefore did not impose upon the Sheriff the legal duty to arrest Ray for his assaults on Vickie.

9

¶23 The District Court also determined that no special relationship existed between Vickie and Ray so as to trigger a duty on the Sheriff's part to protect Vickie from Ray. It reasoned that the Sheriff had made no specific promises to protect Vickie from Ray, but rather, had merely responded to calls for assistance. Finally, the court concluded that, while the "notice" provisions of § 46-6-602, MCA (1995), imposed a duty on the Sheriff to provide information to Vickie about the availability of legal rights and services to her as a victim of domestic abuse, the statute did "not create a specific duty . . . to protect [her] or guarantee her safety. Moreover, there was no evidence at trial connecting the failure of Thompson to provide such notice with Vickie's death."

¶24 On the basis of the foregoing findings, the District Court concluded that the Sheriff had no "legal duty to protect Vickie Doggett from Ray, and therefore, cannot be held liable to [the Massees] on the causes of action contained in the complaint." The Massees appeal.

## STANDARD OF REVIEW

¶25 A judgment as a matter of law entered pursuant to Rule 50(b), M.R.Civ.P., may be granted only where it appears as a matter of law that a party could not prevail upon any view of the evidence including the legitimate inferences to be drawn therefrom. *Somont Oil Co., Inc., v. A & G Drilling,* 2002 MT 141, ¶ 38, 310 Mont. 221, ¶ 38, 49 P.3d 598, ¶ 38 (*citing Ryan v. City of Bozeman* (1996), 279 Mont. 507, 510, 928 P.2d 228, 229).

¶26 Moreover, "[t]he courts will exercise the greatest self-restraint in interfering with the constitutionally mandated processes of jury decision. Unless there is a complete absence of any credible evidence in support of the verdict, a [judgment as a matter of law] motion is not

10

properly granted." *Ryan*, 279 Mont. at 510, 928 P.2d at 229-230. "Our review of a jury verdict is very narrow in scope. Substantial evidence need only be evidence which from any point of view could have been accepted by the jury as credible." *Moralli v. Lake County* (1992), 255 Mont. 23, 27, 839 P.2d 1287, 1290 (citation omitted). We have also stated that "[s]ubstantial evidence is defined as that evidence that a reasonable mind might accept as adequate to support a conclusion. Although it may be based upon weak and conflicting evidence, in order to rise to the level of substantial evidence it must be greater than trifling or frivolous." *Kitchen Krafters v. Eastside Bank* (1990), 242 Mont. 155, 164, 789 P.2d 567, 572 (*overruled on other grounds in Busta v. Columbus Hosp.Corp.,* (1996), 276 Mont. 342, 916 P.2d 122)(citation omitted).

¶27    The existence of a legal duty is a matter of law to be determined by the court. *LaTray v. City of Havre*, 2000 MT 119, ¶ 18, 299 Mont. 449, ¶ 18, 999 P.2d 1010, ¶ 18. This Court's standard of review of a question of law is whether the legal conclusions of the trial court are correct. *MacKay v. State*, 2003 MT 274, ¶ 14, 317 Mont. 467, ¶ 14, 79 P.3d 236, ¶ 14. Although jury verdicts are treated with deference, the Court also gives deference to a trial court's post-verdict ruling which is contrary to the jury's decision. *Chambers v. City of Helena*, 2002 MT 142, ¶ 44, 310 Mont. 241, ¶ 44, 49 P.3d 587, ¶ 44.

¶28    Lastly, in evaluating a motion for judgment as a matter of law, "the court must view all of the evidence in a light most favorable to the non-moving party." *DeMars v. Carlstrom* (1997), 285 Mont. 334, 336, 948 P.2d 246, 248 (citation omitted).

11

## DISCUSSION

¶29     We first address a dispute between the parties concerning the scope of the Massees' appeal.   Thompson and Broadwater County argue that, because the Massees did not specifically appeal from the District Court's refusal to instruct the jury that violations of the "arrest" and "seizure" statutes were negligence *per se,* they cannot now argue that evidence that these statutes were violated supported the jury's verdict.

¶30     Negligence *per se*, or negligence as a matter of law, provides that the violation of a statute renders one negligent under the law.  Black's Law Dictionary, Seventh Edition.  To establish negligence *per se,* a plaintiff must prove that 1) the defendant violated the particular statute; 2) the statute was enacted to protect a specific class of persons; 3) the plaintiff is a member of that class; 4) the plaintiff's injury is of the sort the statute was enacted to prevent; and 5) the statute was intended to regulate members of defendant's class. *Estate of Schwabe v. Custer's Inn*, 2000 MT 325, ¶ 23, 303 Mont. 15, ¶ 23, 15 P.3d 903, ¶ 23.  Common law negligence, on the other hand, is the failure to use the degree of care that an ordinarily prudent person would have used under the same circumstance.  The four elements of a common law negligence claim are duty, a breach of that duty, causation and damages.  Each of these elements must exist for a negligence claim to proceed.  *See, e.g., Henricksen v. State*, 2004 MT 20, ¶ 20, 319 Mont. 307, ¶ 20, 84 P.3d 38, ¶ 20.

12

¶31     During the trial, the jury was presented with evidence that the Sheriff failed to comply with the following domestic abuse statutes[1]–§§ 46-6-602, -603, and -311, MCA (set forth verbatim in ¶¶ 34-37 below). After all the evidence was presented and prior to jury deliberation, the court instructed the jury on the applicable law.  The court informed the jury that 1) "negligence is the failure to use reasonable care"; 2) "negligence may consist of action or inaction"; 3) "a sheriff or deputy is negligent if he fails to act as an ordinarily prudent sheriff or deputy would act under the circumstances"; and 4) "an act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of a third person which is intended to cause harm, even though such conduct is criminal" [sic].

¶32     The jury was also instructed that it could find the Sheriff negligent *per se* if it concluded that he failed to provide Vickie with notice of her rights under § 46-6-602, MCA (1995).  The court refused to instruct the jury, however, that it could also find the Sheriff negligent *per se* for failing to arrest Ray under § 46-6-311, MCA (1993 and 1995), or for failing to seize Ray's weapon under § 46-6-603, MCA (1995).  The court concluded that these "arrest" and "seizure" statutes gave the Sheriff the discretion to arrest Ray or seize his weapon; therefore, the court concluded, the statutes did not impose mandatory legal duties

---

[1]  The Massees also argued that the Sheriff failed to comply with § 46-6-601, MCA (1993 and 1995).  We will not discuss this statute or its application to this case because no evidence was presented that violation of this statute caused Vickie's death.

13

on the Sheriff.[2] While the Massees objected at trial to the court's refusal to present these negligence *per se* jury instructions regarding arrest and weapon seizure, they did not specifically appeal the District Court's Decision on these grounds.

¶33 We conclude that the Sheriff's argument that the failure to appeal from the court's refusal to give negligence *per se* instructions should limit the scope of Massees' appeal, is without merit. The jury received the full panoply of instructions on common law negligence. Though the District Court refused to instruct that violation of the "weapon seizure" or "arrest" statutes was negligence *per se*, the Massees were still permitted to--and did--argue that violation of these statutes by the Sheriff was *evidence* of negligence. We have held that, even if a violation of a statute does not constitute negligence *per se*, such violation may nonetheless be considered as evidence of negligence. *Nehring v. LaCounte* (1985), 219 Mont. 462, 468, 712 P.2d 1329, 1333. Because the Massees have appealed from the District Court's entry of judgment as a matter of law, they have preserved their right to argue that the jury had before it sufficient evidence of negligence--including evidence that the subject statutes were violated by the Sheriff--to support the jury's verdict.

¶34 As stated above in ¶ 31, the relevant domestic abuse statutes in this case are §§ 46-6-602, -603, and -311, MCA. Section 46-6-602, MCA (1993) is the "notice" statute for victims of domestic assault that was in effect during the 1994 incidents between Vickie and Ray. It provides:

---

[2] However, the court later acknowledged that the "weapon seizure" statute did impose mandatory duties.

14

Whenever a peace officer arrests a person for domestic abuse, as defined in 45-5-206, if the victim is present, the officer shall advise the victim of the availability of a shelter or other services in the community and give the victim immediate notice of any legal rights and remedies available. The notice must include furnishing the victim with a copy of the following statement:

"IF YOU ARE THE VICTIM OF DOMESTIC ABUSE, the county attorney's office can file criminal charges against your abuser. You have the right to go to court and file a petition requesting any of the following orders for relief:
(1) an order restraining your abuser from abusing you;
(2) an order directing your abuser to leave your household;
(3) an order preventing your abuser from transferring any property except in the usual course of business;
(4) an order awarding you or the other parent custody of or visitation with a minor child or children;
(5) an order restraining your abuser from molesting or interfering with minor children in your custody or a family member or partner, as defined in 45-5-206; or
(6) an order directing the part not granted custody to pay support of minor children or to pay support of the other party if there is a legal obligation to do so".

¶35    In 1995, prior to Vickie's death, § 46-6-602, MCA, was revised and strengthened.

It read:

Whenever a peace officer arrests a person for partner or family member assault, as defined in 45-5-206, or responds to a call in which partner or family member assault is suspected, the officer, outside the presence of the offender, shall advise the victim of the availability of a shelter or other services in the community and give the victim immediate notice of any legal rights and remedies available. The notice must include furnishing the victim with a copy of the following statement:

"The city or county attorney's office can file criminal charges against an offender if the offender committed the offense of partner or family member assault.

In addition to the criminal charges filed by the state of Montana, you are entitled to the following civil remedies:

You may go to court and file a petition requesting any of the following orders for relief:

(1) an order of protection that prohibits the offender from threatening to hurt you or hurting you;

(2) an order of protection that directs the offender to leave your home and prohibits the offender from having any contact with you;

(3) an order of protection that prevents the offender from transferring any property except in the usual course of business;

(4) an order of protection that prohibits the offender from being within 1,500 feet or other appropriate distance of you, any named family member, and your worksite or other specified place;

(5) an order of protection that gives you possession of necessary personal property;

(6) an order of protection that prohibits the offender from possessing or using the firearm used in the assault.

If you file a petition in district court, the district court may order all of the above and may award custody of your minor children to you or to the other parent. The district court may order visitation of your children between the parents. The district court may order the offender to pay support payments to you if the offender has a legal obligation to pay you support payments.

The forms that you need to obtain an order of protection are at _____. You may call _____ at _____ for additional information about an order of protection.

You may file a petition in district court at _____.

You may be eligible for restitution payments from the offender (the offender would repay you for costs that you have had to pay as a result of the assault) or for crime victims compensation payments (a fund administered by the state of Montana for innocent victims of crime). You may call _____ at _____ for additional information about restitution or crime victims compensation.

The following agencies may be able to give you additional information or emergency help. (List telephone numbers and addresses of agencies other than shelters with secret locations and a brief summary of services that are available.)"

¶36    In 1995, § 46-6-603, MCA,--the "weapon seizure" statute--was enacted.  This statute

dictates the circumstances under which law enforcement must seize a weapon used or

threatened to be used in a partner or family member assault.

> (1) A peace officer who responds to a call relating to partner or family member assault shall seize the weapon used or threatened to be used in the alleged assault.
>
> (2) The responding officer may, as appropriate:
> (a) take reasonable action necessary to provide for the safety of a victim and any other member of the household;
> (b) transport or arrange for the transportation of the victim and any other member of the household to a safe location; and
> (c) assist a victim and any other member of the household to remove necessary personal items.
>
> (3) A weapon seized under this section may not be returned to the offender until acquittal or until the return is ordered by the court.

This statute and the 1995 version of § 46-6-602 apply to the 1996 and 1997 domestic

incidents between Ray and Vickie.

¶37    The legislature determined in 1991 that the preferred response in certain domestic

abuse situations was to arrest the alleged abuser.  Section 46-6-311, MCA (1993),--the

"arrest" statute--codified this legislative decision.

> (1) A peace officer may arrest a person when a warrant has not been issued if the officer has probable cause to believe that the person is committing an offense or that the person has committed an offense and existing circumstances require immediate arrest.
>
> (2) The summoning of a peace officer to a place of residence by a family member or partner constitutes an exigent circumstance for making an arrest. Arrest is the preferred response in domestic abuse cases involving injury to the victim, use or threatened use of a weapon, violation of a restraining order, or other imminent danger to the victim.

17

¶38    In 1995, the legislature made some minor revisions to the statute that do not impact the outcome of this case.

¶39    In summary, based on these statutes, 1) at all times between 1994 and 1997, while discretionary, the statutorily-preferred response in domestic abuse situations was to arrest the alleged abuser; 2) in 1994, the Sheriff was required to give Vickie notice of her victim's rights only if he arrested Ray; 3) after 1995, the Sheriff was required to give Vickie notice of her victim's rights whenever he responded to a domestic dispute call generated by Vickie, Ray or the boys; and 4) in 1996 and 1997, the Sheriff was required to seize any weapon used or threatened to be used in a domestic assault, and could only return the weapon upon acquittal or by Court order.

¶40    Our first charge in this case is to determine whether the court's conclusions of law were correct. *MacKay*, ¶ 14. Our second charge is to determine whether the jury was presented with any credible evidence that, when viewed in a light most favorable to Vickie's sons, would support its verdict that the Sheriff was negligent and that his negligence caused Vickie's death. *Ryan*, 279 Mont. at 510, 928 P.2d at 229-30 and *DeMars v. Carlstrom* (1997), 285 Mont. at 336, 948 P.2d at 248.

¶41    A negligence cause of action entails four elements--duty, a breach of that duty, causation and damages. *Henricksen,* ¶ 20. When considering negligence claims against a public entity or person, such as Sheriff Thompson, it is necessary to consider the "public duty doctrine." The public duty doctrine provides that a governmental entity cannot be held

18

liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff. Black's Law Dictionary, Seventh Edition. In other words, "a duty owed to all is a duty owed to none." *Nelson v. Driscoll* (1999), 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21. An exception to the public duty doctrine's immunity provision arises when a "special relationship" between the victim and officer has been created. *Nelson*, ¶ 22.

¶42 As we explained in *Nelson*, a special relationship gives rise to a special duty, and can be established under any one of the following circumstances: 1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; 2) when a government agent undertakes specific action to protect a person or property; 3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and 4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff. *Nelson*, ¶ 22. We now turn to the question of whether such a special duty existed here.

¶43 The Massees maintain that the Sheriff had a special duty to Vickie by virtue of a special relationship that arose under the first circumstance listed in *Nelson*. They contend that the domestic abuse statutes were written specifically to protect domestic violence victims, a class of which Vickie was a member. Indeed, these statutes were enacted to prevent domestic abuse from escalating to a point of serious injury or death--Vickie's exact fate. Significantly, Thompson agreed that Vickie was a member of the protected class of domestic violence victims. Moreover, during the trial, the District Court expressly

concluded, "that Vickie falls within that statutorily protected class of victims of domestic violence, that . . . title 46, chapter six, part six, domestic violence provisions. She is clearly a member of that class. And so [Sheriff Thompson] would have a duty to her under that." Therefore, there was no question at trial--from either the parties or the court--that the Sheriff had a special duty to Vickie as a member of the protected class of domestic abuse victims.

¶44    Because it was undisputed at trial that Thompson had a special relationship with Vickie by virtue of her being within a statutorily-protected class, an exception to the public duty doctrine exists. Therefore, it is unnecessary for us to address the Massees' request on appeal that we abrogate the public duty doctrine. Moreover, because it was undisputed that a special relationship was created between the Sheriff and Vickie under the domestic abuse statutes, we need not determine whether a special relationship was also created under the second circumstance listed in *Nelson*, as argued by the Massees.

¶45    With the undisputed existence of a duty running from the Sheriff to Vickie by virtue of her status as a domestic abuse victim, we must now determine whether credible evidence was presented to the jury to support its finding that the Sheriff breached that duty.

¶46    We first address the Massees' claim that, at all times relevant to the case before us, the Sheriff had a statutory duty to provide Vickie with a notice of her rights under § 46-6-602, MCA. Such notice, as indicated above, informs victims of their rights to have an abuser arrested, to obtain orders of protection, and to remove an abuser from the home. It also provides a victim with information about community organizations and agencies specifically designed and created to offer assistance to domestic abuse victims.

20

¶47 The Sheriff testified that under the 1993 version of § 46-6-602, MCA, he was required to give Vickie notice only if he arrested Ray, and that because he did not arrest Ray, failure to give notice was not a violation. This testimony, however, was undermined by the Sheriff's further testimony (described in greater detail in ¶ 49 below) that during the December 1994 incident, he had substantial grounds to arrest Ray and, inexplicably, chose not to do so. He admitted that the preferred response under the law would have been arrest, at which time his obligation to give Vickie her notice rights would have become mandatory. The Sheriff also agreed that the 1995 version of the statute made it mandatory that he give notice whenever responding to a domestic abuse call, or a call which he suspected was a domestic abuse call. Moreover, the Sheriff repeatedly testified that despite having the notice forms available to him and having given them to numerous other Broadwater County abuse victims, he did not give Vickie notice of her victim's rights at any time between 1994 and 1997. There was, therefore, substantial evidence from which the jury could conclude that, by failing to comply with the 1995 mandatory notice statute, the Sheriff was negligent, and arguably, negligent *per se.*

¶48 We now examine the Massees' argument that the Sheriff breached his duty to arrest Ray and to seize Ray's .44 magnum handgun on more than one occasion, and that such breach of duty caused Vickie's death. We note that the jury was correctly instructed that the Sheriff's negligence was a cause of Vickie's death if "it was a substantial factor in bringing it about."

21

¶49 Throughout the trial, the Massees presented substantial evidence describing Ray wielding his pistol and making threats to kill himself and others. Specifically, in December 1994, a deputy of the BCSO stated in his report that he observed Ray holding a pistol to Vickie's head. The Sheriff's report indicated that he heard, while en route to the Doggetts' home, that Ray was holding a gun on Vickie. One of the deputies who responded to the call testified that Ray threatened him with bodily harm if the deputy did not leave Ray's house. The Sheriff and various deputies testified that when the Sheriff arrived at the Doggetts' house, within minutes, the Sheriff had to wrestle the loaded gun away from Ray to keep Ray from shooting himself. The Sheriff also testified that he had substantial grounds to arrest Ray for holding a gun to Vickie's head and threatening a police officer and could likely have gotten a conviction. He further testified that it was, in part, his decision to not arrest Ray but he could not explain why that decision had been made. The Sheriff confiscated Ray's gun for a short period of time after this incident, but returned it later.

¶50 Again, the Massees testified that in December 1996, Ray had pulled a gun on Vickie's son, James, and his friend, Roger. James and Roger reported this incident to the BCSO. Later that evening, Ray called and threatened to kill Roger, as well as Vickie, James and Michael. Roger signed a written statement describing the threats. No investigation was undertaken, Ray was not arrested, nor was his gun seized. The law at that time mandated that a gun used or threatened to be used in a domestic event be confiscated. Contrary to the District Court's categorization of this event as a "threatened suicide" that did not require confiscation of Ray's gun under § 46-6-603, MCA, the Sheriff testified that Ray's pointing

22

of the gun at James constituted family member assault and did require that Ray's gun be seized.

¶51   Lastly, evidence was presented that in April 1997, Vickie's two younger sons, Michael and Marcus, called the BCSO reporting that Ray and Vickie were having a terrible argument. Marcus made the call while Michael went to get his .22 rifle for protection. Michael had seen Ray point a gun at Vickie before he retreated to his bedroom to stay with Marcus. Marcus did not report Ray's gun to the dispatcher when he called because he had stayed in his room and was unaware that Ray had it. When the officers arrived, they found Ray's loaded handgun in his bedroom. Testimony was presented that an officer unloaded the gun, returned the pistol to the bedside table, and left the bullets on the dresser. No officer who responded to the call ever investigated this incident or asked the boys or Vickie if Ray had used his gun that night. Had they asked the boys what happened, the deputies and/or the Sheriff would have had a mandatory obligation to arrest Ray, confiscate his gun, and give Vickie her notice of victim's rights. However, they did not ask and did not follow up with any further investigation.

¶52   Over the course of the trial, several deputies testified that they believed Ray should have been arrested and taken into custody for his own protection or the protection of others, and that his handgun should have been seized and kept in accordance with the statute. Additionally, Dr. Mark Mozer, a clinical psychologist with more than thirty years experience, testified about his extensive work in assessing and evaluating persons with mental illnesses and behavioral problems. He stated that he had evaluated hundreds of cases

23

involving battered spouses. He reviewed many of the Sheriff's logs and reports pertaining to emergency calls from the Doggetts' household or response calls to the Doggetts' home. He also listened to a summary of 9-1-1 calls from Vickie, Ray, and the boys, and he studied the Sheriff's deposition.

¶53 Dr. Mozer testified at length that Ray should have been arrested or taken into custody. He outlined the benefits that could have been derived by getting Ray into the judicial system, including alcohol treatment and a work program, which may have eased Ray's depression. Moreover, this would have forced him to recognize that his behavior had consequences and "would have decreased the likelihood of further aggression and would have likely averted [this] tragic event."

¶54 Dr. Mozer also stated that mandatory seizure of a weapon used or threatened to be used in a domestic assault situation is an "excellent idea," because it removes a deadly weapon from a volatile situation and is an actual punishment for "bad behavior." He pointed out that after the Sheriff confiscated Ray's gun in December 1994 and refused to return it for a couple of months, the Doggetts did not request BCSO intervention for two years. He posited that removal of the gun could have, in part, cause this deceleration of calls to the Sheriff's Office.

¶55 Additionally, Dr. Mozer repeatedly emphasized the importance of having an objective third party inserted into a domestic violence or abuse situation. He explained that victims of recurring and ongoing violence tend to reach a state of "pervasive denial." He opined that providing the statutorily-required victim's notice increased the likelihood that the victim

24

would get a third party involved. Such third party involvement, he stated, would help identify the various problems, both with the individuals involved and with their relationship, that could trigger violence. It would keep the victim from "forgetting" about the abuse the next morning, after the almost-inevitable apology is rendered. He maintained that third party agencies help a victim recognize and appreciate the seriousness of the situation and help them address it.

¶56 Dr. Mozer further opined that Vickie did not appreciate the dangerousness of her situation and that had she been told of resources available to her as an abuse victim, and utilized those resources, a treatment plan for the problems may have been developed and kept on track.

¶57 In addition, and importantly to our analysis, the Sheriff himself testified that the purpose of notifying victims of their rights is to help them understand the dangerousness of their situation. He agreed that domestic abuse victims rarely recognize this danger but, nonetheless, look to law enforcement for protection. Thus, the District Court's conclusion in its Decision and Order as a matter of law that "There was no evidence at trial connecting the failure of Thompson to provide such notice with Vickie's death" (*see* ¶ 23) was patently wrong.

¶58 The Sheriff offered no expert or lay testimony to refute Dr. Mozer's testimony that this tragic event "would have likely [been] averted" had the Sheriff taken any or all of the above actions. In addition, both defense witnesses-- the Undersheriff and one of the deputies

who had responded to calls to the Doggetts' home--agreed with the Massees' claims that Ray should have been arrested and his weapon seized.

¶59    With the foregoing evidence in mind, we now turn to the District Court's conclusion that, because the "arrest" duty was discretionary, not mandatory, the Sheriff could not be held liable for failing to arrest. We also consider the court's conclusion that, because the mandatory weapon seizure statute applied only to the December 1996 and April 1997 events, and those events did not give rise to a mandatory duty to seize the weapon, that statute was not violated. In that these legal conclusions formed the basis for the court's determination that no duty was owed to Vickie, we must examine them for correctness. *MacKay*, ¶ 14.

¶60    Throughout this Opinion, we have set forth significant testimony--from the Massee sons and other witnesses, and, most importantly, from the Sheriff and his deputies--that the Sheriff negligently failed to give notice to Vickie of her statutory rights, that he failed to confiscate Ray's gun, and that he failed to arrest Ray when he should have. There was also undisputed testimony from the Massees' experts that these failures were a substantial factor in bringing about Vickie's death. This being so, it was error for the District Court to conclude as a matter of law that, 1) violation of the mandatory notice statute could not support a verdict of negligence; 2) the mandatory "weapon seizure" statute did not apply to the December 1996 family member and domestic assault incident; and 3) because the "arrest" statute imposed no mandatory duties on the Sheriff, its violation could not support a verdict of negligence against the Sheriff. As we discussed above, a jury may base a finding

26

of negligence upon evidence of violation of a statute, even if violation of the statute is not necessarily negligence *per se. Nehring,* 219 Mont. at 468, 712 P.2d at 1333.

¶61 There is nothing in the record that indicates upon which theory of negligence the jury's verdict was based. The special verdict completed by the jury simply asked whether the Sheriff was negligent as defined by the instructions, and, if so, whether his negligence was a cause of the Massees' injuries or damages. The jury responded "yes" to both questions. The jury could well have premised its verdict, in whole or in part, upon its conclusion that the Sheriff negligently violated one, two, or all three of the domestic abuse statutes. Such a conclusion would be permitted under the law, regardless of whether negligence *per se* instructions were or were not given.

¶62 We conclude that the Massees presented sufficient evidence to the jury for it to conclude under the common law negligence jury instructions that the Sheriff "failed to use reasonable care" and failed to act "as an ordinarily prudent sheriff or deputy would act under the circumstances." Contrary to the District Court's finding, they also presented sufficient evidence for the jury to determine that the Sheriff was negligent *per se* for failing to give the required notices, and that such failure was a substantial factor in bringing about Vickie's death. Moreover, as to causation, it is the fact finder's responsibility to determine the credibility of a witness and to attribute the amount of weight appropriate to a witnesses' testimony. *See Sandman v. Farmers Ins. Exchange*, 1998 MT 286, ¶ 40, 291 Mont. 456, ¶ 40, 969 P.2d 277, ¶ 40. This Court will not substitute its judgment for that of the fact finder. *See State v. Felando* (1991), 248 Mont. 144, 148, 810 P.2d 289, 291. The jurors

were polled on the question of causation, and nine members determined that the Sheriff's negligence satisfied the causation element of the negligence claim.

¶63 Lastly, we address the concern that a ruling for the Massees would "signify an erosion of law enforcement's discretion" and render such discretion "illusory." Amicus Montana Sheriffs and Peace Officers Association argues that Thompson acted within his lawful discretion in this case and that this Court should not "second-guess law enforcement officers when they are acting within their lawful discretion." We are not engaging in any such endeavor. We reiterate that while the "arrest" statute bestows discretion, the Sheriff's duties under both §§ 46-6-602 and -603, MCA, were not discretionary but mandatory. As noted above, we simply conclude that, on these facts and under the law as given to the jury, the jury had before it sufficient credible evidence to conclude that the Sheriff's negligence or negligent *per se* conduct led to Vickie's death. This being so, the entry of judgment to the contrary was not properly granted. *Ryan*, 279 Mont. at 510, 928 P.2d at 229-30.

## CONCLUSION

¶64 Based on the foregoing, we conclude sufficient credible evidence was presented to the jury to support its verdict. We further conclude that the District Court's legal conclusions underlying its entry of judgment as a matter of law were incorrect. Therefore, we reverse the District Court's Decision and Order granting Sheriff Thompson's and Broadwater County's Motion for Judgment as a Matter of Law, and reinstate the jury verdict and subsequent judgment dated March 20, 2003, in favor of the Massees.

28

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM REGNIER

Justice James C. Nelson specially concurs and dissents.

¶65    I concur in the analysis and in the result of our Opinion with one exception.    I disagree with our application of the judicially-created public duty doctrine.    Accordingly, I respectfully dissent from that portion of our Opinion.

¶66    This case directly raises the question of whether the abolition of sovereign immunity under Article II, Section 18 of the Montana Constitution precludes application of the judicially-created public duty doctrine.  We have declined to address this argument in favor of simply applying the public duty doctrine.  I would hold that this doctrine is a variant of sovereign immunity, is violative of Montana's Constitution and, therefore, has no application in Montana law.

## DISCUSSION

¶67    As background for this separate Opinion, I will briefly trace the origins of  sovereign immunity and the public duty doctrine and the roles that each theory has played to shield governments from liability for wrong-doing.  Sovereign immunity prevents government liability by holding a governmental entity immune from suit even when its officers breach a duty.  On the other hand, the public duty doctrine prevents government liability by declaring that no duty exists.  Both doctrines preclude a court from awarding just compensation to the injured victim for injury perpetrated by the negligent governmental tortfeasor.  Both doctrines frustrate the clear will of the people of Montana expressed in Article II, Section 18 of our Constitution.

### *A. Sovereign Immunity*

¶68    Sovereign immunity, which is synonymous with governmental tort immunity, proclaims that the government is not liable for the negligent acts of its officers and employees.  Barry L. Hjort, *The Passing of Sovereign Immunity in Montana: The King is Dead!*, 34 Mont. L. Rev. 283, 283 (1973).  With its origins in the divine right of kings as construed by the common law of England, the doctrine held that the King could not be sued in the King's Court because the Court's authority was subordinant to the King.  Therefore, sovereign immunity functioned as a jurisdictional bar and persons unjustly injured by an action of the crown might properly seek monetary redress in the Court of the Exchequer. *Hjort*, at 284.  The English courts extended tort immunity to local units of government on the grounds that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience."  *Russell v. The Men of Devon* (K.B. 1788), 100 Eng. Rep. 359 (holding the men of the unincorporated county of Devon immune from suit by a wagon owner who was injured crossing a poorly maintained county bridge).

¶69    Imported to the United States during the Nineteenth Century, the doctrine of sovereign immunity sustained intense criticism by courts and legal scholars as "an anachronism without rational basis in a democratic society" and as an abrogation of traditional tort principles, which provide remedies for victims of negligent or wrongful conduct.  W. Page Keeton, *et al.*, *Prosser & Keeton on the Law of Torts* § 125 (4th ed. 1971).  Nevertheless, sovereign immunity remained a vital legal construct in most states, shielding public coffers and government actors from liability through the late Twentieth Century.

¶70    Montana courts embraced sovereign immunity during the territorial period. *Langford v. King* (1868), 1 Mont. 33, 38 (holding that citizens may not sue the territorial government in the absence of the government's consent); *Fisk v. Cuthbert* (1877), 2 Mont. 593. The Montana Constitution of 1889 neither authorized nor prohibited sovereign immunity and courts struggled through the Twentieth Century to apply the doctrine with consistency and reason. *Hjort*, at 289-93 (discussing selective application of immunity based upon judicial distinctions between government's proprietary and discretionary functions and judicial recognition of a waiver of immunity to the extent of government's liability insurance coverage).

¶71    The Delegates to the 1972 Montana Constitutional Convention unequivocally rejected governmental tort immunity concluding that "the doctrine no longer has a rational justification in law." Report of the Bill of Rights Committee, 1972 Montana Constitutional Convention, Vol. II, at 637. As reported by the Bill of Rights Committee:

> [T]he doctrine of sovereign immunity bars tort suits against the state for negligent acts by its officials and employees. The committee finds this reasoning repugnant to the fundamental premise of the [sic] American justice: all parties should receive fair and just redress whether the injuring party is a private citizen or a governmental agency. The committee believes that just as the government administers a system of justice between private parties it should administer the system when the government itself is alleged to have committed an injustice. The committee notes that private firms are liable for the negligence of their employees and points out this fact to indicate the inconsistency of the state's position in the system of tort law. It is the belief of the committee that this proposed provision rectifies this inconsistency.

Report of the Bill of Rights Committee, 1972 Montana Constitutional Convention, Vol. II, at 637-38.

32

¶72    Delegate Marshall Murray stated in the deliberations on the proposed section:

> This is the doctrine [of sovereign immunity]--all of us know it--the vernacular that the king can do no wrong.  It is an old and archaic doctrine. . . .  We feel that the doctrine of sovereign immunity, which we are attempting to do away with by this particular provision, really means that the king can do whatever he wants but he doesn't have to pay for it; and we'd like to do away with that doctrine.

Verbatim Transcripts of the Montana Constitutional Convention,  p. 1760 (March 8, 1972).

¶73    Delegate Wade Dahood, chairman of the Bill of Rights Committee, further explained:

> What our committee is really concerned about is making sure that an antiquated doctrine that had no place within American jurisprudence in the first instance is removed from the face of justice in the State of Montana. . . . We have an opportunity now, as long as in Montana no one else will accept it, to make sure that we have full redress and full justice for all of our citizens. . . .  We submit it's an inalienable right to have remedy when someone injures you through negligence and through a wrongdoing, regardless of whether he has the status of a governmental servant or not. . . .

Verbatim Transcripts of the Montana Constitutional Convention, pp. 1763-64 (March 8, 1972).

¶74    Placed within the Declaration of Rights, Article II, Section 18 of the Montana Constitution states:

> **State subject to suit**.  The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature.[3]

¶75    Upon the heels of voter approval of the 1972 Montana Constitution, the 1973 Legislature enacted the Tort Claims Act and the Comprehensive State Insurance Plan,

---

[3]    The provision allowing the Legislature to provide for governmental tort immunity by a two-thirds majority was approved by referendum vote in 1974.

33

codified at §§ 2-9-101 to 318, MCA, which attach "liability to the State in the same manner and to the same extent that liability attaches to a private person."[4] *State ex rel. Byorth v. District Court* (1977), 175 Mont. 63, 67, 572 P.2d 201, 203. Section 2-9-102, MCA, provides:

> **Governmental entities liable for torts except as specifically provided by legislature**. Every governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties whether arising out of a governmental or proprietary function except as specifically provided by the legislature under Article II, section 18, of The Constitution of the State of Montana.

Read together, Article II, Section 18 of the Montana Constitution, and § 2-9-102, MCA, establish the general rule that the State and local governmental entities have no tort immunity unless the Legislature explicitly confers immunity by a two-thirds vote of both houses. *Whiting v. State* (1991), 248 Mont. 207, 222, 810 P.2d 1177, 1186.

¶76    Within four years of enacting the Torts Claims Act, the 1977 Montana Legislature reinstated limited governmental tort immunity by excepting from liability certain discretionary acts of public officials and placing caps on damage awards. *See* Title 2, Chapter 9, Part 1, Montana Code Annotated (1977). Section 2-9-111(2), MCA (1977), as amended, granted immunity to a governmental entity for "an act or omission of its legislative

---

[4]    This Court also held, however, that certain common law personal immunities, separate and distinct, were not affected by Article II, Section 18. *See State ex rel. Dept. of Justice v. District Court* (1976), 172 Mont. 88, 560 P.2d 1328 (the doctrine of prosecutorial immunity is not affected by Article II, Section 18); *Koppen v. Board of Medical Examiners* (1988), 233 Mont. 214, 759 P.2d 173 (the doctrine of quasi-judicial immunity is not affected by Article II, Section 18). Judicial and legislative immunity also exist by statute. Sections 2-9-111 and 112, MCA.

34

body or a member, officer or agent thereof." The statute further elaborated that, "the term 'legislative body' includes the legislature . . . and any local governmental entity given legislative powers by statute, including school boards." Section 2-9-111(1)(b), MCA (1977). Although governmental entities generally remained liable for the torts of employees under § 2-9-102, MCA (1977), judicial interpretation of the legislative immunities granted pursuant to § 2-9-111, MCA (1977), as amended, yielded a roiling series of decisions by this Court during the next fourteen years that affirmed broad governmental tort immunity. *See, e.g., W.D. Constr. v. Board of County Comm'rs* (1985), 218 Mont. 348, 707 P.2d 1111 (county enjoys immunity from negligence suit for commission's failure to administer subdivision statutes and regulations); *Bieber v. Broadwater County* (1988), 232 Mont. 487, 759 P.2d 145 (county enjoys immunity from wrongful discharge suit as a result of commission's ratification of janitor's firing by county employee); *Peterson v. Great Falls Sch. Dist. No. 1* (1989), 237 Mont. 376, 773 P.2d 316 (school board enjoys immunity from wrongful discharge suit as a result of board ratification of janitor's firing by administrative assistant); *State ex rel. Eccleston v. District Court* (1989), 240 Mont. 44, 783 P.2d 363 (school board enjoys immunity from negligence suit because board's refusal to hire additional janitors accounted for janitor's failure to clear ice from school steps). *See also* John A. Kutzman, *The King's Resurrection: Sovereign Immunity Returns to Montana,* 51 Mont. L. Rev. 529, 542 (1990) (postulating that judicial use of agency analysis reinstated blanket sovereign immunity for government's administrative acts).

¶77     The 1991 Legislature addressed the widening scope of governmental tort immunity

by amending § 2-9-111, MCA, to limit the terms under which entities enjoyed statutory immunity. *See* Chap. 821, L. 1991. The amendments restricted legislative immunity by clarifying that "the term legislative act does *not* include administrative actions undertaken in the execution of a law or public policy." Section 2-9-111(1)(c)(ii), MCA (1991) (emphasis added). The amended statute also provides that the purchase of liability insurance does not waive immunity. Section 2-9-111(4), MCA (1991). Regarding environmental torts, the statute specifically denies governmental tort immunity for "any act or omission that results in or contributes to personal injury or property damage caused by contamination or other alteration of the physical, chemical, or biological properties of surface water or ground water, for which a cause of action exists in statutory or common law or at equity." Section 2-9-111(5)(b), MCA (1991).

¶78 A body of case law since the 1991 amendment affirms that a governmental entity is subject to suit for injury to a person or property resulting from an administrative action of a government employee acting within the scope of employment. *See, e.g.*, *Koch v. Billings Sch. Dist. No. 2* (1992), 253 Mont. 261, 833 P.2d 181 (physical education teacher's instruction to student to squat press 360 pounds not a legislative act; school board has no immunity for teacher's negligence); *Hedges v. Sch. Dist. No. 73* (1992), 253 Mont. 188, 832 P.2d 775 (school district has no immunity from suit for teacher's negligent injury of a student with shot put); *Knight v. Missoula* (1992), 252 Mont. 232, 827 P.2d 1270 (street repair is an administrative function; city has no immunity from suit for negligent maintenance); *Dagel v. Great Falls* (1991), 250 Mont. 224, 819 P.2d 186 (supervisor's

36

harassment of city employee not a legislative act; city has no immunity from suit for nuisance); *Sanders v. Scratch Gravel Landfill Dist.* (1991), 249 Mont. 232, 814 P.2d 1005 (public landfill district has no immunity from suit for damages caused by a contaminated water supply); *Quirin v. Weinberg* (1992), 252 Mont. 386, 830 P.2d 537 (property assessor's misrepresentation of building location is administrative act; State enjoys no immunity from action in negligence). *See also* James E. Conwell, *Limitations on Legislative Immunity: A New Era for Montana's Sovereign Immunity Doctrine*, 54 Mont. L. Rev. 127 (1993).

### B. Public Duty Doctrine

¶79     The public duty doctrine is a judicially-created precept succinctly expressed by this Court in a logical absurdity: "[A] duty owed to all is a duty owed to none." *Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21 (citation omitted).

¶80     The genesis of the public duty doctrine in the United States may be traced to *South v. Maryland* (1856), 59 U.S. 396, 18 How. 396, 15 L.Ed 433.  In *South*, the plaintiff alleged that he was kidnapped, held for four days and released only when he paid ransom money to his kidnappers.  Asserting that the local sheriff knew that he had been unlawfully detained yet did nothing to obtain his release, South sued the sheriff for nonfeasance.  The circuit court awarded South a substantial judgment.  The United States Supreme Court reversed and declared that a sheriff's duty to keep the peace was "a public duty, for neglect of which he is amenable to the public, and punishable by indictment only." *South*, 59 U.S. at 403.

¶81     While logic would suggest that a duty to the public is a duty to everyone, rather than a duty to no one, the common law public duty doctrine provides that for one to recover in

tort for the failure of a governmental officer to act properly, it must be shown that the duty

breached was owed to the injured person individually and not merely to the general public.

A popular Nineteenth Century treatise explained the rule as follows:

> [I]f the duty which the official authority imposes upon an officer is a duty to
> the public, a failure to perform it, or an inadequate or erroneous performance,
> must be a public, not an individual injury, and must be redressed, if at all, in
> some form of public prosecution.  On the other hand, if the duty is a duty to
> the individual, then a neglect to perform it, or to perform it properly, is an
> individual wrong, and may support an individual action for damages.

T. Cooley, *A Treatise on the Law of Torts* 379 (1879).

¶82    The public duty doctrine gained acceptance in the courts of most states, including

Montana, where the precept often was applied to cases involving allegations of negligent

police protection.

¶83    Generally, those who advocate for the doctrine argue that it protects government

entities from a flood of lawsuits that could potentially cripple the public coffers and that it

protects those entities which provide much needed but high risk services, where potential

liability or the fear of potential liability would eliminate those services.  *See* Frank Swindell,

*Municipal Liability for Negligent Inspections in Sinning v. Clark--A "Hollow" Victory for

the Public Duty Doctrine*, 18 Campbell Law Review 241, 249-51 (Spring 1996).

¶84    On the other hand, the doctrine has been criticized because it allows government

entities to use the shield of sovereign immunity when the legislature no longer mandates

such immunity; when application of the doctrine requires plaintiffs injured by a negligent

official  suffer solely because of the governmental status of the tortfeasor; when application

of the doctrine promotes incompetence by providing no meaningful incentive for the government entity to provide services of optimal quality; and because, even when the doctrine is eliminated, plaintiffs must still prove duty, breach of duty, causation and damages--a substantial burden in any negligence suit. Moreover, given the wide availability of liability insurance, government entities may limit exposure of the public treasury while still compensating injured individuals. *Swindell*, at 249-51

¶85    In Montana, citing *South v. Maryland* for the proposition that no liability attaches in common law for a sheriff's breach of duty, this Court rejected the claims of Butte landowners that the county was liable for the sheriff's failure to protect their property during a riot. *Annala v. McLeod* (1949), 122 Mont. 498, 504, 206 P.2d 811, 814-15. Acknowledging that the sheriff had both a statutory and common law duty to conserve the peace, this Court observed that the duty was to the public and no statute fixed civil liability. Therefore, common law controlled the case and assigned no liability for breach of a public duty. The Court concluded that neither the sheriff nor the local government were liable for the homeowners' damages. *Annala,* 122 Mont. at 504, 206 P.2d at 814.

¶86    Without naming the public duty doctrine, this Court noted in *Phillips v. Billings* (1988), 233 Mont. 249, 253, 758 P.2d 772,775, that "[t]he majority rule states that [a police officer's] general duty to protect does not give rise to liability for a particular individual's injury absent a greater duty imposed by a special relationship." Then, in *Nelson*, we further explained how a special relationship gives rise to a special duty, which attaches liability in common law for the negligent acts of government actors. A special relationship may be

39

created: (1) by a statute intended to protect a specific class of persons from a particular type of harm and the plaintiff is a member of that class; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff. *Nelson,* ¶ 22 (citing *Day v. State* (Utah 1999), 980 P.2d 1171, 1175).

¶87    In *Nelson*, a police officer stopped a couple under suspicion of driving while intoxicated. The officer did not arrest the driver, but directed her to park the car and offered the couple a ride home. The couple declined the offer and began walking along the roadway, where the woman was struck by a drunk driver and died. Her husband sued the officer and the county for negligence. Examining the circumstances in which a police officer enters a special relationship with an individual, the Court recounted that an officer has a special duty to protect a person who is in the officer's custody or control; to protect third parties from harm by a person in police custody; and to protect persons for whom the officer has voluntarily provided service. *Nelson*, ¶¶ 25-38. Although the decedent was not in police custody at the time of the accident, the Court concluded that a special relationship existed because the officer assumed a duty to protect the woman from a foreseeable risk of harm when he restricted her driving privilege. *Nelson*, ¶ 39. Since a question remained whether the officer failed to exercise reasonable care when he allowed the woman to walk home, summary judgment was inappropriate. *Nelson*, ¶ 40.

¶88    The analysis of the duty owed by governmental entities under the public duty doctrine

has come under increasing scrutiny in recent years, especially as courts have applied the doctrine to shield governments from liability when sovereign immunity is unavailable as a bar against tort actions. Deborah L. Markowitz, *Municipal Liability for Negligent Inspection and Failure to Enforce Safety Codes*, 15 Hamline J. Pub. L. & Pol'y 181, 187 (Spring 1994). A significant number of states where strong statutory provisions or judicial decisions abrogate governmental tort immunity now reject the public duty doctrine altogether. *Adams v. State* (Alaska 1976), 555 P.2d 235; *Ryan v. State* (Ariz. 1982), 656 P.2d 597; *Leake v. Cain* (Colo. 1986), 720 P.2d 152; *Commercial Carrier Corp. v. Indian River County* (Fla. 1979) 371 So.2d 1010; *Fowler v. Roberts* (La. 1989), 556 So.2d 1; *Jean W. v. Commonwealth* (Mass. 1993) 610 N.E.2d 305; *Maple v. Omaha* (Neb. 1986), 384 N.W.2d 254; *Doucette v. Town of Bristol* (N.H. 1993), 635 A.2d 1387; *Schear v. Board of County Comm'rs* (N.M. 1984), 687 P.2d 728; *Wallace v. Ohio DOC* (Ohio 2002), 773 N.E.2d 1018; *Brennen v. Eugene* (Or. 1979), 591 P.2d 719; *Coffey v. Milwaukee* (Wis. 1979), 247 N.W.2d 132; *DeWald v. State* (Wyo. 1986), 719 P.2d 643.

¶89    Article II, Section 18 of the Montana Constitution, abolishes sovereign immunity in Montana by ensuring that every person has the fundamental right to sue a Montana governmental entity for injury to person or property. This constitutional provision also provides that governmental entities may be immunized from suit by statute enacted upon a two-thirds vote of both houses of the Legislature. Since the precepts of the public duty doctrine have never been codified, the common law public duty doctrine, as applied by the Court in the case at bar, exists only by dint of judicial decree in Montana. Because the

41

public duty doctrine works to create governmental tort immunity in the absence of an explicit legislative grant of immunity and infringes upon the fundamental constitutional right of persons to sue a Montana governmental entity for injury to person or property, I would hold that the public duty doctrine has no place in Montana jurisprudence.

¶90 As for Justice Regnier's special concurrence, I do not disagree that the Montana Sheriffs' and Peace Officers' Association has raised legitimate concerns and arguments. The point is, however, that, *under the Constitution*, it is the Legislature's job to deal with those concerns; it is not this Court's.

¶91 Indeed, the rebuttal to our approach is best articulated by former Chief Justice Jean A. Turnage in *Galt v. State Dept. of Fish, Wildlife* (1987), 225 Mont. 142, 731 P.2d 912. Chief Justice Turnage cautioned against resolving cases on the basis of judicially-created theories by ignoring the Constitution. Specifically, Chief Justice Turnage stated:

> This Court should not resort to creating or finding legal theories when a result can be reached from express constitutional language.

*Galt*, 225 Mont. at 149, 731 at 916 (Turnage, C.J., concurring).

¶92 Here, the express language of Montana's Constitution resolves the legal question at issue in this case. We err in relying on a judicially-created legal theory to the exclusion of the Constitution.

## CONCLUSION

¶93 I would hold that the unequivocal intent of the Delegates to the 1972 Constitutional Convention, embodied in Article II, Section 18 of the Montana Constitution, was to abolish

42

sovereign immunity and to expose governmental entities to suit for injury to a person and property in exactly the same way that private persons and private non-human entities are exposed. Within a year of the ratification of the Constitution, Montana voters approved a legislative referendum that conferred upon the Legislature the power to enact by a two-thirds majority in both houses specific statutory exceptions that limit the exposure of governmental entities to suit. I conclude that the common law public duty doctrine, which provides that government actors owe no duty to the general public in the absence of a special relationship between a governmental entity and a specific individual, works to reinstate governmental tort immunity by judicial decree and frustrates the will of the people as expressed in Article II, Section 18 of our Constitution.

¶94 Indeed, if something akin to the public duty doctrine is to continue as part of Montana law as an exception to Article II, Section 18, of our Constitution, then the Constitution itself unambiguously provides for the method and clearly delineates the proper branch of government to accomplish that task. It is the Legislature's prerogative, not the Judiciary's.

¶95 I would hold that the constitutional abrogation of governmental tort immunity under Article II, Section 18 of the Montana Constitution precludes judicial application of the public duty doctrine, and I would reinstate the jury's verdict in this cause without reference to that doctrine.

¶96 I respectfully dissent from our failure to so hold.

/S/ JAMES C. NELSON

43

Justice Jim Reginer specially concurs.

¶97 I agree with the Court's Opinion and write separately to respond to the special concurrence and dissent of Justice Nelson.

¶98 I agree with most of Justice Nelson's analysis and conclusion that it is difficult to sustain the Public Duty Doctrine in light of Article II, Section 18, of the Montana Constitution which abolished sovereign immunity in this state. I would not, however, in the case *sub judice* abolish the Public Duty Doctrine which has heretofore been judicially recognized in Montana.

¶99 The Massees have clearly asked us to abolish the doctrine, albeit in rather conclusory fashion in roughly one page of their opening brief with little argument as to the facts of this case. The Montana Sheriffs and Peace Officers Association filed an amicus brief wherein the Association presents a seemingly legitimate argument that we must preserve the Public Duty Doctrine, at least to the extent that law enforcement discretion in effecting arrests and addressing claims of domestic abuse is preserved. The Association urges that Montana statutes grant the discretion to arrest but do not mandate arrest.

¶100 In my judgment, the Association's concern should be thoroughly examined and reviewed before this Court seriously considers abolishing the Public Duty Doctrine as it applies to discretionary arrests of law enforcement. The Massees' reply brief does not address in complete fashion the concerns expressed by the Association. Since the abolishment of the Public Duty Doctrine is not critical to the outcome of this case, I would leave this discussion to another day.

45

/S/ JIM REGNIER

Justice Patricia O. Cotter joins in the foregoing special concurrence.

/S/ PATRICIA O. COTTER