
DA 06-0073

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 87

ELEANOR M. PROSSER, RICHARD H. WHITE
and LORRAINE CROTTY,

        Plaintiffs and Appellants,

  v.

KENNEDY ENTERPRISES, INC., d/b/a KENNEDY'S
TAVERN & CASINO, VICKI KENNEDY and
THE CITY OF HAMILTON,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DV-03-74
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Howard C. Greenwood, Attorney at Law, Hamilton, Montana

        For Appellee City of Hamilton:

            William L. Crowley and Cynthia K. Thiel, Boone, Karlberg, P.C., Missoula,
            Montana

Submitted on Briefs:  September 12. 2007

Decided:  March 12, 2008

Filed:

_____
                    Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Eleanor M. Prosser (Prosser), Richard H. White (White), and Lorraine Crotty (Crotty) (collectively Neighbors) appeal from the order of the Twenty-First Judicial District, Ravalli County, granting summary judgment to the City of Hamilton (City).

¶2 We review the following issues on appeal:

¶3 *Do Hamilton City Ordinances § 17.116.010 and § 17.116.050 impose a "special duty" on the City to protect residents in the vicinity of a proposed building modification?*

¶4 *Does a condition that the City places on a building modification permit impose a "special duty" on the City when it is deciding whether to enforce that condition?*

**FACTUAL AND PROCEDURAL HISTORY**

¶5 Vicki Kennedy, on behalf of Kennedy Enterprises, Inc. (collectively Kennedy) purchased property in Hamilton at 1013 South First Street on March 1, 2000. The property originally had been constructed as a Kentucky Fried Chicken restaurant and was zoned for commercial uses. The property bordered residentially zoned property to the west, unzoned property to the south and east, and commercially zoned property to the north. The Neighbors all resided, at some time during this litigation, on the residentially zoned property immediately to the west of Kennedy's property.

¶6 Kennedy submitted Precise Plan of Design No. 2015 (the Plan) in April 2000 to the City. Kennedy proposed to modify the property for the commercial uses of a casino and lounge. The Hamilton City Zoning Board of Adjustment (Board) held a hearing regarding the Plan on April 25, 2000. White and Crotty attended. White raised concerns regarding the Plan, including car headlights shining into his windows. The Board considered White's comments, as well as other public comments, incorporated some of the comments into the

2

Plan, and then adopted the Plan through Office of Community Development Resolution 20-14 (the Resolution). The Board included in the Resolution a condition stating that "[t]he developer shall comply with all federal, state and local laws," (the Condition). The City subsequently issued Kennedy a temporary certificate of occupancy for the casino on January 1, 2001, followed by a permanent certificate of occupancy on April 30, 2002.

¶7 Neighbors allege that Kennedy's casino became an unbearable nuisance immediately after it opened for business. Neighbors complained of loud music, loud patrons, revving car engines, fights, loud garbage dumping, and drug use, occurring on the Kennedy property at all hours of the night. Neighbors contend that these disturbances unreasonably interfered with the use and enjoyment of their property. Neighbors claim that they complained about Kennedy's casino to various City officials, including the City Council, the Police Chief, and the Mayor. Neighbors allege, however, that they received no satisfactory resolution to their complaints.

¶8 Neighbors filed this lawsuit against the City and Kennedy in district court on March 6, 2003. Neighbors brought tort claims for compensatory damages against the City, alleging, among other things, that the Board had violated City ordinances when it approved the Plan, that various City officials had failed to take legal action against Kennedy, and that various City officials had failed to abate a nuisance at Kennedy's casino. Neighbors also sought compensatory and punitive damages against Kennedy for intentionally or recklessly maintaining a nuisance, and asked the court to enjoin Kennedy from creating or continuing the nuisance.

3

¶9 The City filed a motion for summary judgment on May 30, 2003, with regard to all of Neighbors' claims against the City. The District Court held a hearing on August 13, 2003, and granted summary judgment on September 27, 2005, in favor of the City on all claims. The City filed an unopposed motion asking the court to certify the summary judgment order as final pursuant to M. R. Civ. P. 54(b). The District Court granted the motion and entered final judgment on October 27, 2005. The Neighbors timely appealed.

## STANDARD OF REVIEW

¶10 We review de novo a district court's decision to grant summary judgment, using the same criteria applied by the district court under M. R. Civ. P. 56. *GRB Farm v. Christman Ranch, Inc.*, 2005 MT 59, ¶ 7, 326 Mont. 236, ¶ 7, 108 P.3d 507, ¶ 7. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c). We draw all reasonable inferences in favor of the party opposing summary judgment. *Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 16, 321 Mont. 432, ¶ 16, 92 P.3d 620, ¶ 16.

## DISCUSSION

¶11 We address on appeal only those claims raised by Neighbors. Neighbors' separate action against Kennedy for compensatory and punitive damages, as well as injunctive relief, remains pending in District Court. Nothing in our analysis here affects the validity of Neighbors' claims against Kennedy. Neighbors finally will be allowed to pursue these claims once we have resolved their appeal against the City.

4

¶12 Neighbors argue on appeal that the City breached two "special duties." Neighbors first claim that the City, acting through the Board, breached a "special duty" to protect the Neighbors when it passed the Plan in violation of Hamilton City Ordinances. Neighbors also claim that the City, acting through various City officials, breached a "special duty" owed to Neighbors when it refused to abate the alleged nuisance. The District Court determined pursuant to the public duty doctrine that neither the City, nor its officials, owed any "special duty" to Neighbors when passing the Plan or when deciding whether to take actions to abate the alleged nuisance. Neighbors admit the validity of the public duty doctrine, but argue that they fall within the "special relationship" exception to that doctrine. The Neighbors assert no other basis for imposing a duty on the City on appeal other than through the "special relationship" exception to the public duty doctrine.

¶13 The Dissent labels the Court's characterization of Neighbors' position on appeal as "patently untrue." Second Dissent, ¶ 70. In truth, however, a review of the Neighbors' briefs reveals that they raise four issues for review. In truth, nowhere in any of the four issues raised do the Neighbors challenge the validity of the public duty doctrine. Neighbors instead assert repeatedly that the District Court erred in not agreeing with their claims that a "special relationship" existed between the City and Neighbors. The Court normally confines its review to the issues actually presented on appeal. Regardless of what Neighbors may have argued in the District Court, we must confine our review to the issues actually raised by Neighbors on appeal. *See e.g. In re P.D.L.*, 2004 MT 346, ¶ 14, 324 Mont. 327, ¶ 14, 102 P.3d 1225, ¶ 14. The Dissent nevertheless launches into an entirely gratuitous analysis of the public duty doctrine with respect to sovereign immunity. Second Dissent, ¶¶ 72-75.

5

Neighbors abandoned this argument on appeal and we need not address it. *See e.g. Skinner v. Allstate Ins. Co.*, 2005 MT 323, ¶ 9, 329 Mont. 511, ¶ 9, 127 P.3d 359, ¶ 9.

¶14 In a similar vein, the Dissent, entirely on its own accord, attempts to convert Neighbors' tort claims against the City into an action for inverse condemnation. Second Dissent, ¶¶ 76-97. We normally decline to engage in this type of back-seat lawyering and decline to do so now. *See e.g. Elliot v. Montana Dept. of Revenue*, 2006 MT 267, ¶ 15, 334 Mont. 195, ¶ 15, 146 P.3d 741, ¶ 15. The Dissent insists that Neighbors alleged and pursued an inverse condemnation action. The Dissent contends in part that the City's approval of the Plan caused the Neighbors' property to depreciate in value. Second Dissent, ¶¶ 92-97.

¶15 The Dissent's argument founders on several factors. First, appellant Prosser purchased her property in December of 2001, more than a year *after* the City had adopted the Resolution on April 25, 2000. "[I]t is a general rule of the law of eminent domain that any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser." *Palazzolo v. Rhode Island*, 533 U.S. 606, 628, 121 S. Ct. 2448, 2463 (2001). This Court specifically has stated that a party cannot complain regarding alleged diminution in value caused by a government action when she purchased the property after the government action. *Knight v. City of Billings*, 197 Mont. 165, 176, 642 P.2d 141, 147 (1982); *see also Johns v. Black Hills Power, Inc.*, 722 N.W.2d 554, 558 (S.D. 2006) (applying subsequent purchaser doctrine).

¶16 The second defect arises from the fact that appellants White and Crotty do not own their residence. They rent. Neighbors' complaint alleges damage to the value of their property or their real property, but it fails to specify whether White and Crotty are

6

leaseholders in the property or merely tenants at will. White's and Crotty's landlord is not a party to this action. As a general rule, a court will award a single amount for each property taken by the government pursuant to an inverse condemnation and a lessee is barred as a matter of law from bringing an inverse condemnation action against the condemning authority for a separate valuation of and award for his leasehold interest. A lessee's remedy lies in instituting an action against the lessor. *Direct Mail Services, Inc. v. Best*, 729 F.2d 672, 676 (10th Cir. 1984).

¶17 Moreover, a split of authority exits regarding whether a tenant at will can recover damages in an inverse condemnation action. *See Nichols on Eminent Domain* vol. 2, § 5.02[6][i] (3d ed., Matthew Bender 2003) ("Tenants holding occupancy under conditions less secure than a lease or month to month tenancy generally have no interest to recover compensation for the taking of property."); 29A C.J.S. *Eminent Domain* § 151 (2007) ("[T]he fact that the lease can be terminated on short notice must be considered in determining the value of the tenant's interest."); 26 Am. Jur. 2d *Eminent Domain* § 232 (2001) ("[A] mere tenant at will . . . is generally not entitled to compensation for the taking of his or her interest . . .."). These factors further militate against the need to pursue unnecessarily the inverse condemnation analysis undertaken by the Dissent.

¶18 The public duty doctrine provides that where a municipality owes a duty to the general public, that duty is not owed to any particular individual. *Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21. The public duty doctrine derives from the practical conclusion that a municipality would be mired hopelessly in civil lawsuits if it were held responsible for every infraction of the law. *Nelson,* ¶ 21. The public duty

7

doctrine prevents individual members of the public from using tort liability to constrain unduly a municipality's discretion to use its limited resources to promote the general welfare. *Nelson,* ¶ 21.

¶19 We have recognized, however, an exception to the public duty doctrine. A person may be able to establish that the municipality owes that person a "special duty" that arises out of a "special relationship" between the person and the municipality. *Nelson,* ¶ 22. A person demonstrates a "special relationship" by establishing that (1) a particular statute was intended to protect a specific class of persons, of which plaintiff is a member, from a particular type of harm; (2) a government agent undertook specific action to protect the plaintiff or the plaintiff's property; (3) the plaintiff was reasonably induced to rely on government action; or (4) under certain circumstances, a third party in custody of the government caused harm to the plaintiff. *Nelson,* ¶ 22. We have held that where the facts are undisputed the question of whether a "special relationship" exists is a question of law. *Nelson*, ¶ 19.

## ISSUE ONE

¶20 *Do Hamilton City Ordinances § 17.116.010 and § 17.116.050 impose a "special duty" on the City to protect residents in the vicinity of a proposed building modification?*

¶21 Neighbors argue first that Hamilton City Ordinances § 17.116.010 and § 17.116.050 imposed a "special duty" on the City when it approved the Plan:

> **Section 17.116.010  Intent.** Precise plan of design is established to provide for orderly development of property to insure compatibility to the surrounding existing and planned land uses.

8

**Section 17.116.050  Rejection or Approval.**  If the proposed precise plan of design would substantially depreciate property values in the vicinity or would unreasonably interfere with the use or enjoyment of property in the vicinity by the occupants thereof for lawful purposes or endanger the public peace, health, safety or general welfare, such plan shall be rejected or shall be so modified or conditioned before adoption as to remove the objections.

Neighbors assert that the City had a "special relationship" with Neighbors pursuant to the first exception to the public duty doctrine because they fall within the specific class of persons whom these ordinances are intended to protect from a particular type of harm.

¶22    We must determine whether the legislative body that passed these ordinances intended them to benefit the general public, or, on the other hand, to protect a specific class of persons from a particular type of harm. *Nelson,* ¶ 22.  We interpret an ordinance by looking first to its plain language. *Small v. Board of Trustees*, 2001 MT 181, ¶ 21, 306 Mont. 199, ¶ 21, 31 P.3d 358, ¶ 21.  We will not determine legislative intent based upon the wording of any particular section or sentence, however, but only from a consideration of the statute as a whole. *In re Marriage of McMichael*, 2006 MT 237, ¶ 14, 333 Mont. 517, ¶ 14, 143 P.3d 439, ¶ 14.  We interpret an ordinance to give effect to its purpose and to avoid absurd results. *In re McMichael*, ¶ 14.

¶23    The ordinances at issue in this case are part of Title 17 of the City of Hamilton Municipal Code of 1999 (Title 17).  Title 17 is entitled "Zoning Ordinance of the City of Hamilton."  Hamilton Mun. Code at § 17.04.010.  Title 17 seeks to "regulate and promote the orderly and harmonious development of the city and its environs . . . ."  Hamilton Mun. Code at § 17.04.020.  Title 17 states that the "regulations and restrictions established in this Title 17 have been made in accordance with a comprehensive master plan . . . ."  Hamilton

9

Mun. Code at § 17.04.030. This master plan serves to (1) "Lessen congestion in the streets;" (2) "Secure safety from fire, panic and other dangers;" (3) *Promote health and general welfare;* (4) "Provide adequate light and air;" (5) "Prevent overcrowding of land;" (6) "Avoid undue concentration of population;" and (7) "Facilitate adequate provisions for transportation, water, sewage, schools, parks and *public requirements*." Hamilton Mun. Code at § 17.04.030 (emphasis added). These provisions indicate that the City intended Title 17 to benefit the general public, rather than a circumscribed class of persons.

¶24     The Dissent implies some sort of sinister motive in noting the fact that the Court obtained the complete version of Title 17 of the Hamilton Municipal Code "from the City of Hamilton in the course of writing the Opinion in this case." Second Dissent, ¶ 62, fn.1. The Dissent presumably also would be troubled by the prospect of the Court obtaining a complete version of a statute contained in the Montana Code Annotated in the course of writing an opinion. We are at a loss to understand the Dissent's apparent concern with the Court obtaining a complete version of the legislative enactment that the parties seek it to interpret when the parties have failed to provide a complete version. Parties rarely, if ever, provide the Court with a complete version of a title to the Montana Code Annotated when they seek to have the Court interpret a section of that title. In fact, this situation occurs with such frequency that the Court provides complete sets of the entire Montana Code Annotated to each Justice on this Court.

¶25     Neighbors ignore the express purpose of Title 17 and focus instead on the mandatory language in § 17.116.050. They argue that the language in § 17.116.050 protects a specific class of persons from a particular type of harm. Neighbors point out that the language in §

10

17.116.050 identifies "occupants" of nearby property as the class of persons to be protected. Neighbors also point out that the ordinance identifies the "use or enjoyment" of the property as the harm from which to protect the occupants. Hamilton Mun. Code at § 17.116.050.

¶26    Section 17.116.050's requirement that the Board consider individual interests in particular land use decisions does not change the fact that Title 17's express purpose is to promote the general welfare. Section 17.116.050 provides for the procedure by which the City reviews proposed development plans in order to "provide for orderly development of property to insure compatibility to the surrounding existing and planned land uses." Hamilton Mun. Code at § 17.116.010. We construe § 17.116.050 as one of the procedures by which the City provides for "orderly development" of property to promote the general welfare, not as an expression of the City's intent to protect anyone who lives in the vicinity of a permitted development from depreciation in property values or an "unreasonable interference with the use and enjoyment of their property."

¶27    Moreover, Neighbors' interpretation of the Precise Plan of Design ordinances would impose an overwhelming burden on the City with potentially adverse consequences. Almost any proposed land development could lead to depreciation in property values or an "unreasonable interference" with a neighbor's use or enjoyment of property. The City would be forced either to deny all but the most benign development plans or face innumerable lawsuits. We do not think that the legislative body that passed these Precise Plan of Design ordinances intended them to place such an undue constraint on the City's discretion to promote the general welfare. *In re McMichael*, ¶ 14. We conclude, as a matter of law, that Hamilton City Ordinances § 17.116.010 and § 17.116.050 do not create a "special

11

relationship" between the City and the Neighbors. Thus, the City, pursuant to the public duty doctrine, had no "special duty" to protect the Neighbors from any harm that might result from the City's adoption of the Plan.

¶28 The Dissents argue that the City intended Title 17 to benefit individual landowners rather than the general public in light of the fact that § 17.116.050 protects "a specific class of persons from a particular type of harm." First Dissent, ¶ 53; Second Dissent, ¶ 63. We determine the intent of a statute, however, by reading the statute as a whole. *In re McMichael*, ¶ 14. We will not defeat the express purpose of Hamilton's zoning regulation-- to promote the general welfare--by focusing on a single procedure within Title 17.

¶29 The Dissent implies that we often defeat governmental immunity by looking to a specific provision within a larger statute. The Dissent cites *State v. District Court*, 246 Mont. 225, 805 P.2d 1272 (1990), and *Newville v. State, Dept. of Family Services*, 267 Mont. 237, 883 P.2d 793 (1994), for the proposition that procedures within a statute should be construed as "a promise by a governmental entity to a class of persons ensuring something." First Dissent, ¶ 52. These cases address quasi-judicial immunity, however, not the public duty doctrine.

¶30 We do not face here the question of whether the Board has quasi-judicial immunity over decisions made pursuant to § 17.116.050. Here we face the question of whether the City intended Title 17--as a whole--to benefit the public welfare, or, on the other hand, a circumscribed class of persons. The express language in Title 17 indicates that the City intended it to benefit the public as a whole, rather than a circumscribed class of persons. Hamilton Mun. Code at §§ 17.04.020, 17.04.030. The Dissent's forced march through this

12

Court's public duty doctrine precedent fails to identify any support for its proposition that the City of Hamilton intended Title 17 to benefit individual landowners to the detriment of the general welfare. Both Dissents fail to provide any support for burdening a City's land use decision-making process with innumerable lawsuits.

¶31 Other jurisdictions have refused to find that land use regulations create a "special relationship" between property landowners and the government. *See e.g. Wolfe v. Bennett PS & E, Inc.*, 974 P.2d 355, 359 (Wash. App. Div. II 1999) (stating that "[g]overnments enact building codes, zoning ordinances, and other land use regulations to protect the health and welfare of the general public," and citing *Taylor v. Stevens County*, 759 P.2d 447, 450 (Wash. 1988) (holding that "the duty to issue building permits and conduct inspections is to protect the health and safety of the general public.")); *Derwort v. Polk County*, 501 S.E.2d 379, 381 (N.C. App. 1998) (holding that the "plain language of the statute and our case law thus indicate that subdivision control is a duty owed to the general public, not a specific individual."); *Myers v. Moore Engineering, Inc.*, 42 F.3d 452, 455 (8th Cir. 1994) (noting that under Minnesota and South Dakota state law "'[b]uilding codes, the issuance of building permits, and building inspections are . . . designed to protect the public and are not meant to be an insurance policy by which the municipality guarantees that each building is built in compliance with the building codes and zoning codes.'" (citations omitted)).

## ISSUE TWO

¶32 *Does a condition that the City places on a building modification permit impose a "special duty" on the City when it is deciding whether to enforce that condition?*

13

¶33     Neighbors allege next that they had a "special relationship" with the City pursuant to the second exception to the public duty doctrine in light of the fact that the City undertook "specific action" to protect the Neighbors and their property.  Neighbors point out that the Board added the Condition in the Resolution that Kennedy "shall comply with all federal, state and local laws."  Neighbors argue that when the City added this condition, "the City took specific action for the protection of [Neighbors], which established a 'special relationship' between the City and [Neighbors] . . . ."  Neighbors also argue on appeal that "[t]he City Administrator, the City Attorney and the Chief of Police all took specific action on behalf of the [Neighbors] by contacting [Kennedy] on behalf of the [Neighbors] to request that [Kennedy] control the loud music."

¶34     Neighbors failed to argue in the District Court, however, that they had a "special relationship" with the City based on the fact that the City undertook a "specific action" to protect the Neighbors or their property.  Neighbors also failed to characterize the Condition as a "specific action" that the City undertook to protect the Neighbors or their property. Neighbors mentioned the Condition only when arguing that "the City refused to enforce" the Condition.

¶35     Neighbors similarly failed to allege to the District Court that the City Administrator, the City Attorney, or the Chief of Police undertook "specific action" pursuant to the second exception to the public duty doctrine.  We are not surprised that the City and the District Court also failed to address the "specific action" exception as the Neighbors premised their complaint and briefs on summary judgment on the fact that the City had failed to take action, not on the fact that the City had taken "specific action" to protect the Neighbors or their

14

property. We will not consider arguments on appeal that the District Court did not have an opportunity to consider below. *Cassady v. Yellowstone County Sheriff*, 2006 MT 217, ¶ 23, 333 Mont. 371, ¶ 23, 143 P.3d 148, ¶ 23.

¶36 Neighbors allege next, pursuant to the third exception to the public duty doctrine, that they were "reasonably induced to rely upon the City to enforce the [C]ondition and to require [Kennedy] to obey all applicable laws which were reasonably necessary to protect the [Neighbors'] interests and property." To establish a "special relationship" under the third exception to the public duty doctrine, the Neighbors must show (1) that there has been direct contact between the public official and the plaintiff; (2) that the official has provided express assurances in response to the plaintiff's specific inquiry; and (3) that the plaintiff justifiably relied on the representations of the official. *E.g. Moore v. Wayman*, 934 P.2d 707, 711-12 (Wash. App. Div. II 1997); *see also Castellani v. Delaware State Police*, 751 A.2d 934, 938 (Del. Super. 1999); *see generally* 57 Am. Jur. 2d *Municipal, County, School and State Tort Liability* § 86 (2001). We have held that "reliance occurs when one is 'rightfully led to a course of conduct or action on the faith that the act or duty will be properly performed.'" *Orr v. State*, 2004 MT 354, ¶ 46, 324 Mont. 391, ¶ 46, 106 P.3d 100, ¶ 46 (citing *Nelson v. Driscoll*, 1999 MT 193, ¶ 36, 295 Mont. 33, ¶ 36, 983 P.2d 972, ¶ 36).

¶37 Neighbors argue that they "relied upon the City to their detriment, because the City refused to enforce the Condition or to enforce the applicable laws." Neighbors' alleged state of mind, standing alone, proves insufficient to establish "justifiable reliance." Neighbors must point us to evidence showing that the Neighbors undertook some action, or refrained from some action, in reliance on the City's alleged promises to enforce the Condition.

15

¶38    We held in *Orr*, for example, that a group of mine employees had met the "justifiable reliance" exception to the public duty doctrine. *Orr*, ¶ 46. The employees had been concerned that ambient dust in the mine might contain asbestos. *Orr*, ¶¶ 4, 46. The employees contended that they had concluded, however, that the dust did not pose any health risks based on the fact that the State had "regularly inspected the [m]ine, but had never reported any danger to the [m]iners." *Orr*, ¶ 46. We held that the State had a "special relationship" with the employees under the third exception to the public duty doctrine because the State's inspections had "rightfully led" the employees to believe that it was safe for the miners to continue working in the mine. *Orr*, ¶¶ 46-47.

¶39    Neighbors, unlike the employees in *Orr*, do not allege that the City "rightfully led" the Neighbors to start, stop, or continue taking any particular course of action. Neighbors instead focus on the City's course of conduct not to enforce the Condition. Neighbors fail to recognize that though the City's subsequent failure to abide by its alleged promise to enforce the Condition in the Resolution may be relevant to the question of whether the City breached a "special duty," it has no relevance to the question of whether the City had a "special duty" in the first place. *Orr*, ¶ 46.

¶40    Moreover, Neighbors have contradicted their own claims that the City assured them of action by admitting in discovery that "[n]ot once did we ever receive assurance or even a response, from the City, that our complaints and our suffering were priorities, or even problems they intended to solve some day." Neighbors respond that this discovery answer referred only to the City Council.

¶41 Neighbors argue in the alternative that various City officials, other than the City Council, did give them specific assurances. For example, Neighbors allege that the City Attorney wrote a letter to Kennedy on December 12, 2001, that warned Kennedy to "immediately reduce and regulate the loudness of the music and other noise emanating from your business." Neighbors point to two legal memoranda that the City Attorney forwarded to the City Administrator that "address[ed] some of the issues that have been raised regarding nuisance complaints by some of the area residents." Neighbors also cite to a handwritten note that the Mayor wrote to the Neighbors where the Mayor stated that he had reviewed a video of the disturbances at Kennedy's casino, and that the Mayor would notify the Neighbors if he needed to meet with them. Neighbors finally point to several entries in the Neighbors' "diary" of the events in this case where they indicate they had meetings with various City officials. Neighbors fail to point to any language in these documents, however, where a City official expressly promised the Neighbors that that official would enforce any particular law or condition.

¶42 We determine that the City has established that no genuine issue of material fact exists with respect to whether the City and the Neighbors had a "special relationship" pursuant to the public duty doctrine. We conclude as a matter of law that the City owed no "special duty" to the Neighbors, thus, we decline to address the Neighbors' remaining claims on breach, causation, and damages.

¶43 We do not doubt or minimize the disruption to the lives of the Neighbors allegedly caused by Kennedy's operation of the casino. The videotapes contained in the record demonstrate repeated and continuous disruptions in the form of loud music, revving car

17

engines, fights, and arguments into the wee hours of the morning. We hold only that the Neighbors must seek redress for these claimed injuries against Kennedy, whose operation of the casino has caused these alleged harms. Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM RICE

Justice W. William Leaphart dissenting.

¶44  I dissent.

¶45  I conclude that based on the special relationship exception, the public duty doctrine does not apply and the City owed a duty to Neighbors. At the time of the incidents giving rise to this lawsuit, Prosser, White, and Crotty were indeed very close neighbors to the Kennedy property. Prosser's residence sat about thirty inches from the Kennedy property, and only fifteen feet from the casino itself. Crotty and White's residence sat fifteen feet from the Kennedy property, and about thirty feet from the casino. A wooden fence separated the Neighbors' properties from the Kennedy property. The Kennedy property was zoned as commercial property, as was the property to the north, which was used as a bank. The properties to the south and east of the Kennedy property were unzoned; however, at the time

18

Kennedy submitted the Precise Plan of Development, the unzoned properties were used as residential properties. Neighbors' properties were zoned as residential property. When Kennedy submitted Precise Plan of Development No. 2015 to the City of Hamilton, zoning board staff mailed notices to all property owners and commercial tenants within 300 feet of the Kennedy property. The notice of proposed use was also published in the local paper and posted at the city hall.

¶46   The majority dismisses the case under the public duty doctrine, but fails to discuss public duty doctrine cases. As stated above, a recognized exception to public duty doctrine immunity arises when a special relationship exists or is created between the victim and the governmental officer. *Massee v. Thompson*, 2004 MT 121, ¶¶ 41-42, 321 Mont. 210, ¶¶ 41-42, 90 P.3d 394, ¶¶ 41-42. "[A] special relationship gives rise to a special duty" in any one of four circumstances, the first of which is "by a statute intended to protect a specific class of persons from a particular type of harm." *Massee*, ¶ 42. In determining whether a special relationship is established pursuant to statute, this Court looks to the relevant statute. *See Orr v. State*, 2004 MT 354, ¶ 47, 324 Mont. 391, ¶ 47, 106 P.3d 100, ¶ 47; *Massee*, ¶¶ 34-39; *Eklund v. Trost*, 2006 MT 333, ¶ 36, 335 Mont. 112, ¶ 36, 151 P.3d 870, ¶ 36.

¶47   In *Orr*, we determined that a special relationship was created between the State and vermiculite miners by statutes which were "designed to protect men and women working in the various industries in Montana from occupational disease." *Orr*, ¶ 44. Although the statutes did not specifically reference miners, miners were members of that specific class of persons. *Orr*, ¶ 44. Thus, the State had a special duty to protect the health and safety of miners from known dangers in their workplace. *Orr*, ¶ 47. This Court concluded that,

19

because a special relationship existed between the State and the miners, the State was "not shielded by the application of the Public Duty Doctrine." *Orr*, ¶ 47.

¶48 In *Massee,* the statutes at issue provided that law enforcement officers were to provide domestic violence victims with a notice of the availability of shelters and any legal rights and remedies such victims may have. *Massee*, ¶ 34. These statutes were enacted to prevent serious injury or death as a result of domestic violence. *Massee*, ¶ 43. The victim in *Massee* died as a result of domestic violence. *Massee*, ¶ 43. Thus, the officer had a special duty to the deceased victim as a member of that protected class, and the public duty doctrine did not apply. *Massee*, ¶¶ 43-44.

¶49 Recently we determined that a statute requiring drivers of police vehicles to proceed with due regard for the safety of all persons created a special class of protected persons. In *Eklund*, a youth escaped from a detention center, stole a vehicle, and led law enforcement on a high speed chase. *Eklund*, ¶¶ 10-15. The chase continued into town where the youth lost control of his vehicle and struck Eklund. *Eklund*, ¶ 17. The statute mandated that officers, while driving in an emergency or high speed situation, still had a "duty to drive with due regard for the safety of all persons." *Eklund*, ¶ 36 (quoting § 61-8-107, MCA (2003)). We held that the statute created a special class of persons encompassing those who, by use of streets and highways, are potential victims of high speed chases. *Eklund*, ¶ 39. Law enforcement owed a duty to drive with due regard to this class of persons, and thus, the public duty doctrine did not apply. *Eklund*, ¶ 39.

¶50 Like the statutes giving rise to a duty to mine workers in *Orr,* the domestic violence victims in *Massee*, and people using the streets in *Eklund*, the ordinances in this case create a

20

duty to a special class of persons. The ordinances at issue in this case, those providing that a precise plan of design must be submitted to the zoning board, are for the purpose of "insur[ing] compatibility to the *surrounding existing* and planned uses." Hamilton Mun. Code (Mont.) § 17.116.010 (2003) (emphasis added). In cases where a proposed use would not be compatible to the surrounding existing uses, the ordinances instruct the zoning board as follows:

> If the proposed plan of design would substantially depreciate property values *in the vicinity* or would unreasonably interfere with the use or enjoyment of property *in the vicinity by the occupants thereof* for lawful purposes . . . such plan shall be rejected or shall be so modified or conditioned before adoption as to remove the objections.

Hamilton Mun. Code at § 17.116.050 (emphasis added). These ordinances are clearly intended to protect occupants in the vicinity of the property that is the subject of the proposed plan of design from incompatible uses. Neighbors were occupants in the vicinity of the Kennedy property. The zoning board recognized this class of persons existed when it specifically mailed notice to every property owner and commercial tenant within 300 feet of the Kennedy property, in contrast to the posted and published notices provided to the general public. In enacting these ordinances, the City recognized that incompatible uses in the same vicinity could depreciate property values and interfere with the occupants' use and enjoyment of their property. Thus, the City had a duty to protect Neighbors from such harm.

¶51 The ordinance then mandates that when plans are submitted that could result in the harm anticipated, the City must modify or reject the plan. Hamilton Mun. Code at § 17.116.050. Here, existing land use on three sides of the Kennedy property was

21

residential. To the north, the land was commercial, but was currently used as a bank. A lounge is not like a bank that closes its doors in the early evening. It stays open into the early morning hours. Lounges often play music to entertain their patrons. Patrons consume alcohol in a lounge. Alcohol impairs judgment and is known to lead to fighting and other rowdy and loud behavior, which directly impacts the surrounding area. Given the high potential for incompatibility, the City owed a duty to Neighbors to modify or condition the plan to correct such conflicts or reject it entirely. The City contends that it fulfilled its duty by conditioning the plan, requiring the casino to limit all activities to the interior of the building. By imposing this condition, the zoning board foresaw the problems that inebriated, unruly patrons could cause in a residential area. However, this condition was clearly not enough to ameliorate the concern.

¶52  The majority interprets the ordinance to be a mere "procedure" for property development rather than an expression of the City's intent to protect residents who live in the vicinity. I submit that the procedure is designed to *ensure compatibility* to the *surrounding area*. Hamilton Mun. Code at § 17.116.010. Procedures created by statute are often, in essence, a promise by a governmental entity to a class of persons ensuring something. In *State v. District Court*, 246 Mont. 225, 232, 805 P.2d 1272, 1277 (1990), we held that statutes required the Workers' Compensation Division to undertake a review process before granting an employer self-insured status. This process is designed to protect a specific class of persons (employees of such businesses) from a particular type of harm—that is, injury while working for an employer without the financial resources necessary to provide benefits. In *Newville v. State, Dept. of Family Services*, 267 Mont. 237, 269, 883 P.2d 793, 812

(1994), we held that the Department of Family Services is required to license and train foster care providers and to investigate adoptive homes. This licensing process is designed to protect a specific class of persons (foster and adoptive children) from a particular type of harm—placement in an unsafe home. *See* § 41-3-101, MCA. Although *State v. District Court* and *Newville* do not discuss the public duty doctrine, they provide examples where the government, without question, owed a duty to a specific class of persons.

¶53   Like the above statutory schemes, the ordinance in question is designed to protect a specific class of persons, those in the vicinity, from a particular type of harm—that is, property devaluation and/or interference with enjoyment of use from incompatible uses.

¶54   The cases the majority references for the purpose of demonstrating that other jurisdictions refuse to find that land use regulations create a special relationship between landowners and the government are distinguishable based on the statutes at issue. In *Wolfe*, the statute at issue was a regulation within the building code that provided that an application would expire if not acted upon within a certain number of days. *Wolfe v. Bennett PS & E, Inc.*, 974 P.2d 355, 359 (Wash. App. 1999). It did not purport to protect a certain class of persons, nor did it specify any particular type of harm it was meant to prevent.

¶55   In *Taylor*, the statute at issue stated that building permits would not be issued to "any applicant or person who fails to provide sufficient evidence of compliance with all laws and regulations relating to the use of land and the construction or improvements of structures thereon." *Taylor v. Stevens County*, 759 P.2d 447, 449 (Wash. 1988). The statute does not specify a particular type of harm it is meant to prevent, or any specific class of persons it is meant to benefit. The plaintiffs in *Taylor* argued that the purpose of the code provisions was

23

to "promote the health, safety and welfare *of the occupants or users of buildings and structures and the general public*." *Taylor*, 759 P.2d at 450 (italics in original). The court in *Taylor* recognized the statute's broad purpose of protecting the public, and distinguished it from a more specific statute with the particular purpose of identifying "conditions and circumstances [which] are dangerous and a menace to the health, safety, morals or welfare of *the occupants* of such buildings and of the public . . . ." *Taylor*, 759 P.2d at 450 (italics in original) (citing *Halvorson v. Dahl,* 574 P.2d 1190, 1192-93 n.1 (Wash. 1978)). In the *Halvorson* case where the more specific statute was at issue, the court determined there was a clear intent to protect occupants of substandard housing despite the "traditional rule that a local government is under no duty, ascertainable in tort, to ensure compliance with its building code." *Taylor*, 759 P.2d at 450 (citing *Halvorson*, 574 P.2d at 1192). The statute was "enacted for the benefit of a specifically identified group of persons as well as, and in addition to, the general public." *Halvorson*, 574 P.2d at 1193.

¶56     Finally, in *Derwort v. Polk County*, 501 S.E.2d 379, 381 (N.C. App. 1998), the subdivision planning statutes at issue referred only to the general welfare, to citizens, and to the public. The statutes did not contain language expressing an intent to protect a specific class from a specific type of harm. Similarly in *Myers v. Moore Engineering, Inc.*, 42 F.3d 452, 456 (8th Cir. 1994), the plaintiffs argued the city negligently issued a building permit, and that the public duty doctrine should not apply because a special relationship existed. The *Myers* plaintiffs, however, failed to point to any particular statute or code provision that would establish a special relationship. *Myers*, 42 F.3d at 456.

¶57    These cases can be further distinguished because, other than in *Halvorson*, 574 P.2d at 1192-93, the courts applied a different test to determine whether a special relationship existed.  Rather than recognizing that statutes can give rise to a special relationship if they are designed to protect a special class of persons from a particular type of harm, the State of Washington stated that a special relationship is created when:

> (1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff.

*Taylor*, 759 P.2d at 451 (citations omitted); *Wolfe*, 974 P.2d at 359 (citations omitted). North Carolina's and North Dakota's test for determining whether a special relationship is created is similar to Washington's and does not address the question of whether a special relationship is created by a specific statute.  *Derwort*, 501 S.E.2d at 382 (citations omitted); *Myers*, 42 F.3d at 456-57.

¶58    Like in *Halvorson*, the City of Hamilton, by including such specific language in the ordinances, expressed a clear intent to protect occupants in the vicinity of a proposed plan of development from a particular type of harm when the proposed plan is not compatible with the surrounding uses.  This Court recognizes, where other jurisdictions have not, that statutes can create special relationships.

¶59    In the present case, given the specificity of the ordinance and the resulting special relationship between the City and those occupying the property in the vicinity of the proposed use, the public duty doctrine does not apply.  I conclude that the City owed a duty of care to Neighbors and would reverse on that basis.

25

/S/ W. WILLIAM LEAPHART

Justice Patricia Cotter joins the dissenting opinion of Justice Leaphart.

/S/ PATRICIA COTTER

Justice James C. Nelson, dissenting.

¶60   I join Justice Leaphart's dissent.  I write separately to address three additional facets of this case.

I

¶61   First, the fallacy of the Court's resolution of Issue One is apparent from its application of selected Hamilton City Ordinances to the exclusion of others.  As Justice Leaphart ably demonstrates, §§ 17.116.010 and 17.116.050 are clearly intended to protect a specific class of persons—occupants in the vicinity of a proposed precise plan of design—from a particular type of harm—substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties.  That the City intended to protect the Neighbors and their properties is evident not only from the plain language of these ordinances, but also from the fact that the zoning board mailed notices to all property owners and commercial tenants within 300 feet of the Kennedy property.  On the facts presented here and the unambiguous language of §§ 17.116.010 and 17.116.050, the special relationship exception to the public duty doctrine clearly applies.

¶62   To avoid what is plain on the face of §§ 17.116.010 and 17.116.050, however, the Court goes outside the record in this case, citing §§ 17.04.020 and 17.04.030 for the

proposition that the general purpose of Title 17 of the Hamilton City Code is "to promote the general welfare."[1]  Opinion, ¶¶ 23, 26.  The Court goes so far as to criticize the Neighbors for focusing on the mandatory language of § 17.116.050.  Opinion, ¶ 25.  Yet, nothing in our caselaw—and the Court cites no Montana authority to support its approach—requires us to look at the general purpose of a collection of statutes to the exclusion of the specific purpose of the particular statute(s) at issue.  In *Massee v. Thompson*, 2004 MT 121, 321 Mont. 210, 90 P.3d 394, for instance, the statutes at issue were §§ 46-6-311, -602, and -603, MCA.  Rather than analyzing the purpose of Title 46 (which governs criminal procedure), we analyzed the purpose of these three particular statutes.  *See Massee*, ¶¶ 34-39, 43.  Likewise, in *Eklund v. Trost*, 2006 MT 333, 335 Mont. 112, 151 P.3d 870, we analyzed the purpose of

---

[1] Neither the Neighbors nor the City cites § 17.04.020 or § 17.04.030.  Indeed, neither of these ordinances is part of the record before this Court.  Rather, the Court obtained copies of these provisions from the City of Hamilton in the course of writing the Opinion in this case.  I do not suggest that the Court had "some sort of sinister motive" in doing so.  *See* Opinion, ¶ 24.  I am simply pointing out that rather than interpret the actual ordinances that the parties have asked us to interpret, the Court instead has obtained copies of ordinances that the parties did *not* ask us to interpret and then interpreted those.  The Court justifies these actions on the ground that "[p]arties rarely, if ever, provide the Court with a complete version of a title to the Montana Code Annotated when they seek to have the Court interpret a section of that title."  Opinion, ¶ 24.  But that is precisely my point:  The parties here sought to have this Court interpret two sections of Title 17; thus, there was no need for them to provide or for us to obtain a complete version of Title 17.  The Court never explains why, under these circumstances, it was necessary to obtain a complete version of Title 17.  Nor does the Court explain why, when the parties here sought to have this Court interpret §§ 17.116.010 and 17.116.050, the Court instead decided to interpret §§ 17.04.020 and 17.04.030.  As for the Court's suggestion that it is appropriate to "obtain[] a complete version of the legislative enactment that the parties seek it to interpret when the parties have failed to provide a complete version," Opinion, ¶ 24, I do not dispute this point.  But again, the parties here have provided "a complete version" of the legislative enactments that they seek us to interpret—namely, §§ 17.116.010 and 17.116.050.  They have not asked us to interpret the entirety of Title 17; thus, there was no need for them to provide it or for the Court to obtain it.

the particular statute at issue, namely, § 61-8-107, MCA. *See Eklund*, ¶¶ 35-39. We did not resort to the general purpose of Title 61 (which governs motor vehicles).

¶63 In the case at hand, by contrast, the Court ignores the express purpose of §§ 17.116.010 and 17.116.050, resorting instead to the general purpose of Title 17. Yet, while a statutory scheme may serve a general purpose of promoting the general welfare, this does not mean that particular statutes contained within that scheme are not intended to protect a specific class of persons from a particular type of harm. The Court's contrary approach is pure sophistry. Under the Court's reasoning, the public duty doctrine should have applied in both *Massee* and *Eklund*, since Titles 46 and 61, MCA, could reasonably be characterized as "promoting the general welfare." Indeed, the rather sweeping purpose of "promoting the general welfare" could apply to just about every title in the Code. Moreover, there is no reason to believe that laws which protect specific classes of persons from particular types of harm do not ultimately promote the general welfare.

¶64 Again, there is no authority supporting the Court's fixation on the general purpose of Title 17 to the exclusion of the specific purpose of §§ 17.116.010 and 17.116.050. The Court states that "[w]e interpret an ordinance by looking first to its plain language." Opinion, ¶ 22. Yet, the Court completely ignores the plain language of §§ 17.116.010 and 17.116.050, preferring instead to focus on select language in §§ 17.04.020 and 17.04.030. The Court states that "[w]e interpret an ordinance to give effect to its purpose and to avoid absurd results." Opinion, ¶ 22. Yet, the Court completely ignores the express purpose of §§ 17.116.010 and 17.116.050, which is to protect occupants in the vicinity of a proposed precise plan of design from substantial property devaluation and/or unreasonable interference

28

with the use or enjoyment of their properties. Moreover, in so doing, the Court reaches the absurd result that these two ordinances do not protect anyone. *See Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21 ("[A] duty owed to all is a duty owed to none." (internal quotation marks omitted)).

¶65    The Court also states that "[w]e will not determine legislative intent based upon the wording of any particular section or sentence, however, but only from a consideration of *the statute* as a whole." Opinion, ¶ 22 (emphasis added). Yet, again, the Court does not consider §§ 17.116.010 and 17.116.050 as a whole, or even at all. Rather, the Court purports to consider Title 17 as a whole and then selects two particular ordinances—§§ 17.04.020 and 17.04.030—as controlling over all the others.

¶66    Moreover, the Court ignores the well-established rule of construction that specific provisions prevail over general provisions. *See Oster v. Valley County*, 2006 MT 180, ¶ 17, 333 Mont. 76, ¶ 17, 140 P.3d 1079, ¶ 17 ("[M]ore specific statutes prevail over general provisions of law."); *Taylor v. Dept. of Fish, Wildlife & Parks*, 205 Mont. 85, 91, 666 P.2d 1228, 1231 (1983) ("We recognize the rule of statutory construction which provides that special statutes will prevail over general statutes."); *see also* § 1-2-102, MCA ("[A] particular intent . . . control[s] a general one that is inconsistent with it."). Here, § 17.116.010 states that the intent of the precise plan of design is "to provide for orderly development of property to insure compatibility to *the surrounding existing . . . uses*" (emphasis added). The specific language of § 17.116.050, states that a proposed precise plan of design "shall" be rejected, modified, or conditioned if such plan "would substantially depreciate property values *in the vicinity* or would unreasonably interfere with the use or

29

enjoyment of property *in the vicinity by the occupants thereof* for lawful purposes" (emphases added). The word "shall" is defined as "mandatory." Hamilton City Ordinance § 17.04.040(B)(3). The import of these provisions—to protect occupants in the vicinity of a proposed precise plan of design from substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties—prevails over any general intent to promote the general welfare. *Oster*, ¶ 17; *Taylor*, 205 Mont. at 91, 666 P.2d at 1231.

¶67　Furthermore, it is not necessarily true that the specific intent of protecting occupants in the vicinity of a proposed precise plan of design is inconsistent with the general intent of promoting the general welfare. The Court opines that these two goals cannot exist in harmony, i.e., that a benefit to individual landowners would be "to the detriment of the general welfare." Opinion, ¶ 30. The Court conjectures that "potentially adverse consequences" to the City, such as "innumerable lawsuits," would result under the Neighbors' interpretation of the ordinances. Opinion, ¶ 27. However, there is nothing in the record to support the parade of horribles feared by the Court. Nor has the Court cited any legal authority for the proposition that the general welfare must suffer whenever a municipality owes a duty to protect occupants in the vicinity of a proposed plan of development from substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties. Indeed, it is equally—if not more—plausible that such a duty would *benefit* the general welfare, not be to its detriment.

¶68　In sum, the Court substitutes what it would have intended when enacting §§ 17.116.010 and 17.116.050 in place of the actual intent expressed by these ordinances. As support for its view, the Court erroneously elevates the broadly-stated, general purpose of

"promoting the general welfare" over §§ 17.116.010 and 17.116.050's specific purpose of protecting occupants in the vicinity of a proposed precise plan of design from substantial property devaluation and/or unreasonable interference with the use or enjoyment of their properties. In so doing, the Court effectively renders the first special-relationship exception to the public duty doctrine (*see Nelson*, ¶ 22) a nullity.

¶69 For the reasons set forth above and in Justice Leaphart's dissent, I conclude that the special relationship exception to the public duty doctrine applies here and that the City owed the Neighbors a duty of care—though this will be small consolation to the Neighbors, who have been condemned by the City and its officials to endure the apparently unregulated hellish conditions created by Kennedy's Tavern & Casino.[2]

II

¶70 Wholly aside from the special relationship exception, the public duty doctrine does not apply here for a second reason. The Court asserts that the Neighbors "admit the validity of the public duty doctrine." Opinion, ¶ 12. This is patently untrue. Nowhere in their briefs do the Neighbors "admit" the validity of the public duty doctrine.

---

[2] As alleged by the Neighbors, those conditions include the following: the Casino's remaining open past 2:00 a.m.; excessively loud music late at night; excessive noise when dumping bottles and refuse in the early morning hours between 4:30 and 6:00 a.m.; creation of a possible fire hazard to the Neighbors' homes by stacking cardboard boxes next to the wooden fence separating the Neighbors' properties from the Casino property; patrons yelling and talking loudly and using vulgar and profane language in the Casino's parking lot late at night; quarreling and fighting in the parking lot; use of drugs and consumption of alcoholic beverages and food outside the Casino; revving and excessive idling of vehicle engines in the parking lot; and patrons urinating in the Neighbors' yards.

31

¶71    As a matter of fact, in the course of this litigation, the Neighbors challenged the

doctrine's constitutionality. At the hearing on the City's motion for summary judgment, the

Neighbors argued as follows:

> Now, with respect to this well-repeated doctrine of the Public Duty Doctrine, in the State of Montana we have a constitutional provision which says that cities will be liable for suit for injury to person or property, except as may be specifically provided by law by a two-thirds vote of each house of the legislature. In other words, the liability of public entities, the state, county, cities and towns, and others, are governed by statute. Now, we have those statutes. The statutes are set forth in Title 7, which covers specifically local government, and it treats the subject of immunity in section MCA Section 7-1-4125, which merely repeats the constitutional provision in the record. In wording it says, "As provided in Article II, Section 18, of the Montana Constitution, a municipality has no immunity from suit for injury to a person or property, except as may be specifically provided by law by a two-thirds vote of each house of the legislature."
>     There have been enacted by law certain limitations on liability. Specifically, in Section 2-9-102, it set a -- said, "Every governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties whether arising out of a governmental or proprietary function except" again, as provided by statute.
>     . . . .
>     Now, the City argues that the common law doctrine of Public Duty Doctrine applies. If it were to apply, it must be enacted by statute. There is no statute, and I beg of them to show me a statute which says that the common law doctrine of Public Duty Doctrine shall apply to municipalities in the State of Montana. No such statute exists. And that doctrine is a common law doctrine. It cannot apply. MCA 1-1-108 says, "In this state there is no common law in any case where the law is declared by statute."
>     As to liability of municipalities in this state, it is declared by statute. And specifically, the whole Title 7 sets forth the responsibilities and liabilities of municipalities. We therefore believe that this Court must rule, as a matter of law, that the Public Duty Doctrine does not apply to municipalities in the State of Montana.

¶72    The Neighbors' argument has merit, and it calls into doubt the premise underlying the

whole of the Court's analysis, namely, that the public duty doctrine survived the enactment

of Article II, Section 18 of the 1972 Montana Constitution. That provision states: "The

32

state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature." Mont. Const. art. II, § 18. Thus, governmental immunity from tort exists in this State only as provided by statutes enacted pursuant to a two-thirds vote of both houses. *See Whiting v. State*, 248 Mont. 207, 221-22, 810 P.2d 1177, 1186 (1991). Moreover, any common law doctrine of governmental tort immunity is no longer available. Mont. Const. art. II, § 18; § 1-1-108, MCA ("In this state there is no common law in any case where the law is declared by statute.").

¶73     As to the public duty doctrine vis-à-vis governmental immunity from tort, the District Court observed in its Opinion & Order as follows:

> "The public duty rule is not technically grounded in government immunity, though it achieves much the same results. Unlike immunity, which protects a municipality from liability for breach of an otherwise enforceable duty to the plaintiff, the public duty rule asks whether there was [any] enforceable duty to the plaintiff in the first place." [Quoting Eugene McQuillin, *The Law of Municipal Corporations* vol. 18, § 53.04.25, at 197-98 (3d ed., West 2003).]

Indeed, at bottom, both governmental tort immunity and the public duty doctrine preclude a plaintiff from obtaining just compensation for injuries perpetrated by a negligent governmental actor. Yet, the public duty doctrine has not been codified in this State by a two-thirds vote of both houses of the Legislature. Rather, the doctrine is a nineteenth-century holdover from the common law—a judicially-created shield insulating governmental entities from liability for negligence and misfeasance. *See generally Massee*, ¶¶ 79-85 (Nelson, J., specially concurring and dissenting). Thus, by effectively providing governmental immunity from tort in the absence of an explicit legislative grant of such

33

immunity, the doctrine serves as an end-around the fundamental right of individuals to sue local governmental entities for injury to person or property—a right that is supposed to be subject to only one exception: laws enacted by a two-thirds vote of both houses of the Legislature.

¶74 The delegates to the 1972 Constitutional Convention unequivocally rejected governmental tort immunity. As reported by the Bill of Rights Committee, the notion of barring tort suits against the State for negligent acts by its officials and employees is "repugnant to the fundamental premise of the [sic] American justice: all parties should receive fair and just redress whether the injuring party is a private citizen or a governmental agency." Montana Constitutional Convention, Comments on the Bill of Rights Committee Proposal, February 22, 1972, p. 637. During the deliberations on the proposed language of Article II, Section 18, Delegate Wade J. Dahood, Chairman of the Bill of Rights Committee, explained:

> We have an opportunity now, as long as in Montana no one else will accept it, to make sure that we have full redress and full justice for all of our citizens. So that way, we reduce public dissatisfaction with the administration of justice and make sure that every citizen of Montana has the full right to which he's entitled. We submit it's an inalienable right to have remedy when someone injures you through negligence and through a wrongdoing, regardless of whether he has the status of a governmental servant or not.

Montana Constitutional Convention, Verbatim Transcript, March 8, 1972, p. 1764.

¶75 The public duty doctrine frustrates the will of the people as expressed in Article II, Section 18, and this Court errs in perpetuating the doctrine's existence 36 years after the adoption of the Constitution. It is long past time that we consign this antiquated doctrine to the dustbin of history, where it belongs.

34

¶76    Lastly, the Neighbors' allegations and arguments raise the question of whether the City's acts and omissions with respect to the Neighbors' properties amount to inverse condemnation—a claim that the City cannot avoid by invoking the public duty doctrine.[3]

¶77    The Fifth Amendment to the United States Constitution states that "private property [shall not] be taken for public use, without just compensation." This guarantee "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960). Thus, for example, it is well-settled that the application of a general zoning law to particular property effects a taking if the law denies the owner all productive or economically beneficial use of the property or excessively interferes with the owner's distinct investment-backed expectations. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 98 S. Ct. 2646 (1978). No precise formula determines when property has been taken (in the constitutional sense); the question necessarily requires a weighing of the private and public interests at issue. *See Agins v. City of Tiburon*, 447 U.S.

---

[3] The Court asserts that I am engaging in "back-seat lawyering" and attempting to "convert" the Neighbors' tort claims against the City into an action for inverse condemnation. Opinion, ¶ 14. Even if I were so inclined to "convert" the Neighbors' tort claims—which I am not—there would be no need to do so. As reflected in their pleadings and arguments in the District Court and on appeal, which I set out in ¶¶ 91-93 below, the Neighbors plainly have raised claims that the City's acts and omissions with respect to the Neighbors' properties amount to inverse condemnation. The Court tacitly concedes this point by proceeding to address the Neighbors' standing to bring these claims in ¶¶ 15-17 of the Opinion.

255, 260-61, 100 S. Ct. 2138, 2141 (1980), *overruled in part on other grounds*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540-45, 125 S. Ct. 2074, 2082-85 (2005).

¶78     In addition, Article II, Section 29 of the Montana Constitution states, in pertinent part: "Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner." By its plain language, this provision affords Montanans a protection that is independent of the Fifth Amendment. If the City, by its acts or omissions, has "taken or damaged" the Neighbors' private property as contemplated by Article II, Section 29, then as a matter of fundamental constitutional right, the City must pay just compensation to the full extent of the Neighbors' loss.

¶79     "Takings cases do not always arise out of situations where the government has formally condemned property. Instead, some regulatory or other activities may effect a taking, necessitating that owners bring inverse condemnation proceedings against the government." Julius L. Sackman, *Nichols on Eminent Domain* vol. 2A, § 6.03[1], at 6-182 (3d ed., Matthew Bender 2006). "Inverse condemnation" is "a generic description applicable to all actions in which a property owner, in the absence of a formal condemnation proceeding, seeks to recover from a governmental entity for the appropriation of his property interest." *Nichols on Eminent Domain* § 6.03[2], at 6-182.1; *see also United States v. Clarke*, 445 U.S. 253, 257, 100 S. Ct. 1127, 1130 (1980) ("The phrase 'inverse condemnation' appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted."). "Such a suit is 'inverse' because it is

36

brought by the affected owner, not by the condemnor. The owner's right to bring such a suit derives from the self-executing character of the constitutional provision with respect to condemnation." *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 5 n. 6, 104 S. Ct. 2187, 2191 n. 6 (1984) (citation and some internal quotation marks omitted).

¶80    State and federal courts favor inverse condemnation as a way for property owners to protect their interests, and state courts recognize a host of actions that constitute valid inverse condemnation actions. *See Nichols on Eminent Domain* § 6.03[2], at 6-184 to 6-186; *see also* Eugene McQuillin, *The Law of Municipal Corporations* vol. 11A, § 32.132.40, at 290-98 (3d ed., West 2000), at 20-22 (Supp. 2007) (discussing a variety of grounds for inverse condemnation actions). *Knight v. City of Billings*, 197 Mont. 165, 642 P.2d 141 (1982) ("*Knight-Billings*") and *Knight v. City of Missoula*, 252 Mont. 232, 827 P.2d 1270 (1992) ("*Knight-Missoula*") provide pertinent illustrations.

¶81    In *Knight-Billings*, the plaintiffs were individual homeowners who owned residences on the west side of 24th Street West in Billings, Montana. They had purchased their properties in the years between 1954 and 1976. In 1975, a large shopping center (Rimrock Mall) was opened on 24th Street West south of the plaintiffs' properties. By the time of the litigation, there were also two large discount stores, a supermarket, a hardware store, a mini-mall, two convenience stores, and several office buildings along 24th Street West, and another supermarket was under construction near the plaintiffs' properties. In addition, the street provided access to an interstate highway from the city proper. *See Knight-Billings*, 197 Mont. at 166-67, 642 P.2d at 141-42.

37

¶82    Until 1972, 24th Street West was a two lane roadway with on-street parking. In 1972, the City of Billings widened 24th Street West to provide four lanes of traffic. In 1976, the city further widened 24th Street West by condemning real property exclusively on the east side of the street. No real property was taken from the west side of the street, where the plaintiffs had their properties. In 1978, the street was widened by the addition of a fifth lane situated in the middle of the other four lanes, to provide for left-hand turns from 24th Street West. Traffic counts on 24th Street West indicated an average daily vehicular traffic flow of 6,330 vehicles in April 1966; 9,684 vehicles in August 1970; 17,040 vehicles in July 1975; and 18,018 vehicles in 1979. *See Knight-Billings*, 197 Mont. at 167-68, 642 P.2d at 142.

¶83    Meanwhile, in 1972, the City of Billings adopted a zoning ordinance, pursuant to which the plaintiffs' properties were zoned as single-family dwellings. In 1978, the plaintiffs petitioned the Billings City Council for a zoning change that would permit their properties to be reclassified as residential professional; however, the proposed zoning change was denied, and in consequence, the plaintiffs' properties remained zoned for residential purposes only. Also in 1978, the city created a lighting maintenance district to provide lighting for 24th Street West. The lights used were of a higher intensity than normally found on a residential street. Although several of the plaintiffs protested the proposal for the lighting district, their protest was denied. *See Knight-Billings*, 197 Mont. at 167-68, 642 P.2d at 142-43.

¶84    After the failure of their petition for a zoning change, the plaintiffs filed an action against the City of Billings charging inverse condemnation of their properties. The evidence at trial revealed the following changes to 24th Street West and the plaintiffs' properties:

38

Formerly [24th Street West] was relatively quiet, and had but two traffic lanes. The front yards of the residences were suitable for family or social gatherings. Residents or their guests could park their cars on the street. There was no difficulty getting in and out of driveways. Sidewalks were safe from passing traffic. Noise and pollutant levels were low and not distracting or harmful. There was no undue refuse. Family pets were safe. There was no noticeable vibration from passing traffic and the area was quiet at night.

After the 1976-78 condemnation project on 24th Street West was completed, conditions changed. There is now no free access into driveways, but instead long waits in the fifth lane for passing traffic. Free access to and from the driveways is nearly impossible. There have been traffic accidents in front of the residential properties, and sometimes upon their properties. Children and pets are not safe in the front yards and pedestrian traffic along the sidewalks a few feet from passing vehicular traffic is dangerous. Average traffic flows at 22 miles per hour past their houses. Rocks and rubbish from passing traffic are thrown upon their lawns and into their houses. The sidewalks are constantly filthy, especially in winter. The noise from the passing traffic is so loud that front doors must be closed for conversation to be heard inside. Traffic noise is loud and aggravating at night. The houses cannot be ventilated from the east side because of dust and exhaust fumes. The houses and contents are constantly subject to vibrations. One of the residents testified that she had to tape her windows to avoid the bright light from the high intensity sodium vapor lighting that was installed.

*Knight-Billings*, 197 Mont. at 168-69, 642 P.2d at 143.

¶85    The district court found that by reason of the changed conditions on 24th Street West, the plaintiffs' properties were " 'no longer desirable for residential use' " and could not " 'be put to the highest and best use without a change in zoning restrictions and regulations.' " However, the court also found that "the conditions on 24th Street West were not caused by the City but by persons using business establishments situated on 24th Street West" and that "the actions of the City of Billings were within the proper exercise of the City's police power." *See Knight-Billings*, 197 Mont. at 170, 642 P.2d at 143.

¶86    On appeal, we addressed the city's contention that its actions were merely in response to the burgeoning development of commercial and other enterprises along 24th Street West,

i.e., that the city had not created the business growth but merely adapted to it. We held that recovery for inverse condemnation is not precluded just because the governmental authority is validly exercising its police powers. To the contrary, recovery may be allowed under theories of easement or nuisance imposed on the plaintiffs' properties. *See Knight-Billings*, 197 Mont. at 170-71, 642 P.2d at 144.

¶87 We also rejected the notion that an actual physical invasion of the plaintiffs' properties by the city had to occur. We concluded that the result of the city's actions had been "to impose a servitude, a limitation upon the use and marketability of plaintiffs' properties as residential." We noted that what remained "is that plaintiffs' properties, through the actions of the City, have become unsuitable for residential use, and the plaintiffs' right to use their properties [for residential purposes] is limited to a degree of constitutional magnitude." *See Knight-Billings*, 197 Mont. at 172-73, 174-75, 642 P.2d at 144-45, 146.

¶88 Finally, we observed that in the 1976-78 widening of 24th Street West, the city had compensated the homeowners on the east side of the street but not the homeowners on the west side of the street. Thus, the plaintiffs had been "consciously singled out or selected to bear a burden which [the city] also consciously elected not to impose on others, even others otherwise similarly situated." *Knight-Billings*, 197 Mont. at 173-74, 642 P.2d at 145 (citation and internal quotation marks omitted). We held that on these facts, the city had "interfered with the private property interests of the plaintiff so as to constitute a 'taking' by inverse condemnation." *Knight-Billings*, 197 Mont. at 174, 642 P.2d at 145-46.

¶89 In *Knight-Missoula*, the plaintiffs alleged that their property had been damaged by noise, dust, fumes, runoff, and increased traffic from a nearby dirt road and the City of

40

Missoula's refusal to close or maintain the road. *Knight-Missoula*, 252 Mont. at 240, 827 P.2d at 1275. We reversed the trial court's grant of summary judgment in favor of the city, ruling that the plaintiffs' inverse condemnation claim was viable. *Knight-Missoula*, 252 Mont. at 243, 827 P.2d at 1277. We held that the plaintiffs had raised genuine issues of material fact regarding diminution in the value of their property by reason of the existence and use of the road and the City of Missoula's refusal to close or maintain it.[4] *Knight-Missoula*, 252 Mont. at 240, 243, 827 P.2d at 1275, 1277.

¶90 Other courts have likewise recognized that inverse condemnation occurs when a continuing nuisance ripens into a constitutional taking. *See e.g. City of Jacksonville v. Schumann*, 167 So.2d 95, 102 (Fla.App. 1964); *see also* Carlos A. Ball, *The Curious Intersection of Nuisance and Takings Law*, 86 B.U. L. Rev. 819 (2006) (exploring the issue of when a nuisance ripens into a constitutional taking and arguing, for purposes of nuisance/takings cases, in favor of the "peculiar and substantial" standard articulated in *Richards v. Washington Terminal Co.*, 233 U.S. 546, 557, 34 S. Ct. 654, 658 (1914)).

¶91 Here, the Neighbors alleged in their complaint that the manner in which Kennedy's Tavern & Casino is operated constitutes a continuing nuisance. The Neighbors also alleged that despite numerous complaints, 911 calls, and requests for relief to City officials, and

---

[4] Notably, we also held that the plaintiffs' nuisance claim survived summary judgment, given the City of Missoula's perpetuation of a "continuing nuisance" by not closing, paving, or otherwise maintaining the road. *See Knight-Missoula*, 252 Mont. at 244-47, 827 P.2d at 1277-79. In so doing, we observed that " 'a city is liable for damages with respect to maintaining a nuisance in the same manner as a private person,' " *Knight-Missoula*, 252 Mont. at 246, 827 P.2d at 1279 (quoting *Walton v. City of Bozeman*, 179 Mont. 351, 356, 588 P.2d 518, 522 (1978)), and that "[sovereign immunity] does not extend

41

despite attending and voicing complaints at many City Council meetings, the City and its various officials failed and refused to take appropriate action to abate the nuisances caused by the manner in which the Casino is operated. Plaintiff Prosser contended that as a result, the value of her property has been diminished. (Plaintiffs White and Crotty rent their property.)

¶92 Likewise, in her answers to the City's First Interrogatories, Prosser stated that the value of her property has been depreciated due to the City's ongoing failure and refusal to enforce the condition, placed on Kennedy's Precise Plan of Design ("PPD"), that the Casino "shall comply with all federal, state and local laws." She provides, under oath, specific examples to this effect, and she requests $80,000 in damages "for loss of sale and inability to sell my home."

¶93 In the Neighbors' brief in opposition to the City's motion for summary judgment, Prosser argued diminution in value of her property by reason of the City's failure and refusal to enforce the PPD condition and abate the nuisances created by the Casino. Again on appeal, the Neighbors assert that Prosser suffered depreciation of property value. They argue as follows:

> Because of the noise and interference with the use and enjoyment of her property due to the nuisances caused by the Casino by being in such close proximity to her property, Occupant Prosser placed her property on the market and tried to sell it but was unable to find a buyer. She and the realtor involved attributed the failure to sell or find a buyer to the existence of the Casino immediately next to her home. [Citations to her affidavit and her answers to the City's interrogatories.]
> By approval of the operation of the Casino by these Defendants in a

---

to a suit for the abatement of a nuisance," *Knight-Missoula*, 252 Mont. at 246, 827 P.2d at 1279.

primarily residential area without assuring compatibility with the surrounding uses which are primarily as residential single family residences, the City promoted and facilitated the Casino's ability to create private and public nuisances in the vicinity by noise and other activities of the Casino and its patrons in such close proximity to Occupants' residences late at night and over an extended period of time causing depreciation of property values in the vicinity and causing unreasonable interference with the use and enjoyment of the property of Occupants.

¶94 The City has never denied that such depreciation could occur. Indeed, recognition of this eventuality is set forth plainly in the language of § 17.116.050, which states: "If the proposed precise plan of design would *substantially depreciate property values in the vicinity . . .* , such plan shall be rejected or shall be so modified or conditioned before adoption as to remove the objections" (emphasis added). Notwithstanding, as argued by the Neighbors, the City has promoted and facilitated the creation and continuation of a nuisance by Kennedy's Tavern & Casino, which in turn has resulted in depreciation of property values in the vicinity, Prosser's abutting property in particular.

¶95 As noted above, private property may only be taken or damaged for "public use." U.S. Const. amend. V; Mont. Const. art. II, § 29. In *Kelo v. City of New London*, 545 U.S. 469, 125 S. Ct. 2655 (2005), the Supreme Court reaffirmed a broad definition of "public use" under the Fifth Amendment—specifically, "public purpose," as opposed to "use by the public." *See Kelo*, 545 U.S. at 478-83, 125 S. Ct. at 2662-64. The Supreme Court held that the City of New London's economic development plan met this broad definition, since the plan (which coordinated a variety of commercial, residential, and recreational uses of land) was designed to promote economic development and provide appreciable benefits to the community, including new jobs and increased tax revenue. *See Kelo*, 545 U.S. at 483-84,

125 S. Ct. at 2664-65. *See also* Julius L. Sackman, *Nichols on Eminent Domain* vol. 2A, § 7.02[2], at 7-28, § 7.02[3], at 7-32, § 7.02[7], at 7-40 (3d ed., Matthew Bender 2006) (noting that the broad meaning of "public use"—e.g., revitalizing the local economy by creating temporary and permanent jobs, or generating a significant increase in tax revenue— has prevailed over the narrow conception of "public use"—i.e., actual use of the acquired property by the public).

¶96     Likewise, in *Rutherford v. City of Great Falls*, 107 Mont. 512, 86 P.2d 656 (1939), this Court considered whether the legislation at issue served a "public purpose," quoting with approval the following definition:

> "A public purpose * * * has for its objective the promotion of the general welfare of all the inhabitants or residents within a given political division, as, for example, a state, the sovereignty and sovereign powers of which are exercised to promote the public health, safety, morals, general welfare, security, prosperity, contentment, and equality before the law of all the citizens of the state."

*Rutherford*, 107 Mont. at 517, 86 P.2d at 658 (asterisks in original) (quoting *Green v. Frazier*, 176 N.W. 11, 17 (N.D. 1920)).   In addition, we observed in *City of Missoula v. Mountain Water Co.*, 228 Mont. 404, 743 P.2d 590 (1987), that § 70-30-102, MCA, provides a "broad interpretation" of "public use." *See Mountain Water*, 228 Mont. at 412, 743 P.2d at 595.   Indeed, § 70-30-102, MCA, enumerates a wide range of public uses. *See generally* § 70-30-102(1)-(45), MCA.[5]

---

[5] Notably, the Legislature recently amended § 70-30-102(12), MCA, to prohibit the taking of private property for urban renewal "if the purpose of the project is to increase government tax revenue." *See* Laws of Montana, 2007, ch. 512, § 2.

¶97 I make no attempt here to determine whether the depreciation of property values in the vicinity of Kennedy's Tavern & Casino, which the Neighbors allege has been promoted and facilitated by the City, serves a public purpose. I am satisfied that the Neighbors' allegations in this regard and the evidence presented thus far are sufficient to survive summary judgment. The Neighbors have established that genuine issues of material fact remain as to whether the City has taken or damaged Prosser's property for public use—perhaps "to promote the general welfare," as the Court endlessly asserts, or to promote economic development, as *Kelo* authorizes—by failing and refusing to take appropriate action to abate the nuisances caused by the manner in which the Casino is operated. To the extent that the City has taken or damaged Prosser's property, she is entitled to just compensation to the full extent of her loss under Article II, Section 29 of the Montana Constitution.

¶98 The Court launches into its own "entirely gratuitous analysis" of these issues in ¶¶ 15-17 of the Opinion. In ¶¶ 16-17, the Court addresses whether Plaintiffs White and Crotty, given that they rent their property, are entitled to compensation under an inverse condemnation theory. It does not appear from the record, however, that White and Crotty are seeking recovery for a taking or damaging. In ¶ 15, the Court apparently reaches the merits of Prosser's inverse condemnation claim, asserting that she cannot recover damages because she purchased her property "after the government action," which the Court assumes was the approval of Kennedy's PPD in April 2000. However, Prosser has alleged that the depreciation in the value of her property is the result of a series of events—including, the City's failure and refusal to enforce the condition, placed on the PPD, that the Casino "shall

45

comply with all federal, state and local laws" and the City's corresponding promotion and facilitation of the ongoing nuisance created by the Casino. *Cf. Blasdel v. Montana Power Co.*, 196 Mont. 417, 425, 640 P.2d 889, 894 (1982) (" 'Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time.' " (quoting *United States v. Dickinson*, 331 U.S. 745, 748, 67 S. Ct. 1382, 1385 (1947))); *Hart v. City of Detroit*, 331 N.W.2d 438, 445 (Mich. 1982) ("It is common for [an inverse condemnation action] to involve a continuous wrong by the condemnor rather than a single act."). The record is replete with allegations that the City's acts and omissions have occurred during the course of Prosser's ownership of her property. Moreover, there exists a factual issue as to whether Prosser's property value has depreciated during her period of ownership as a result of the City's conduct. I submit that it is inappropriate for this Court to decide, as a matter of law, that any and all depreciation in Prosser's property value occurred *prior* to the governmental actions at issue.[6]

---

[6] For these reasons, the Court's statements of the law in ¶ 15 are inapt. The Court asserts that " 'it is a general rule of the law of eminent domain that any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser.' " Opinion, ¶ 15 (alteration omitted) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 628, 121 S. Ct. 2448, 2463 (2001)). This abbreviated quotation of *Palazzolo*, however, fails to reflect the fact that the Supreme Court was referring to a particular type of taking not at issue here. Specifically, the Supreme Court was referring to "a direct condemnation action, or when a State has physically invaded the property without filing suit," i.e., situations in which "the fact and extent of the taking are known." *Palazzolo*, 533 U.S. at 628, 121 S. Ct. at 2463. Such is not the case here, where the fact and extent of the alleged taking or damaging were not known until Kennedy failed to comply with the PPD condition and the City failed or refused to take effective action to enforce the condition. Notably, the Supreme Court went on to state in *Palazzolo* that "[a] challenge to the application of a land-use regulation, by contrast, does not mature until ripeness requirements

¶99 Lastly, the Court misstates my position. I do not contend that the City's approval of Kennedy's PPD "caused" the Neighbors' property to depreciate in value. Opinion, ¶ 14. Rather, I simply observe that Prosser has so alleged. Obviously, this is a factual matter properly resolved at trial. In my view, she should be permitted to litigate the merits of her inverse condemnation claim—including whether the City's actions amount to a taking or damaging for public use, whether the City's actions "caused" Prosser's property to depreciate in value, and whether such depreciation occurred during her ownership of the property. The Court errs in denying her this opportunity.

IV

¶100 The Court errs in concluding that the special relationship exception to the public duty doctrine does not apply on the facts of this case, and I join Justice Leaphart's Dissent as to this issue. Furthermore, the Court errs in perpetuating the public duty doctrine in the face of Article II, Section 18. Finally, the Neighbors have established that genuine issues of material fact remain as to whether the City has taken or damaged Prosser's property for public use for which it owes her just compensation to the full extent of her loss, as required by Article II, Section 29.

¶101 I would reverse and remand this case for further proceedings on the Neighbors' tort claims and Prosser's inverse condemnation claim. I dissent from our failure to do so.

---

have been satisfied . . . . It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner." *Palazzolo*, 533 U.S. at 628, 121 S. Ct. at 2463.

/S/ JAMES C. NELSON

/S/ JAMES C. NELSON